**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 15 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EDDIE LEROY TRICE,

     Petitioner-Appellant,

     v.

RON WARD, Warden, Oklahoma
State Penitentiary,

     Respondent-Appellee.

No. 98-6465

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 96-CV-1336-T)

---

Vicki Ruth Adams Werneke, Assistant Federal Public Defender, Oklahoma City,
Oklahoma, for the appellant.

Robert L. Whittaker, Assistant Attorney General of Oklahoma (W.A. Drew
Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma
City, Oklahoma, for the appellee.

---

Before **KELLY, BRISCOE,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Petitioner Eddie Leroy Trice, an Oklahoma state prisoner sentenced to death after being convicted of first-degree murder, first-degree rape, first-degree burglary, and assault and battery, appeals the district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

On Friday, February 13, 1987, Trice spent most of the day drinking with his roommate, Archie Landon (Landon), and Landon's brother Walter. Trice and Landon returned to their apartment between 5:30 and 6:00 p.m. Landon fell asleep on the couch and did not see Trice again until early the next morning. At some point later that evening, Trice left the apartment and drove to a house occupied by Earnestine Jones, an 84-year-old woman, and her 63-year-old, mentally retarded son Emanuel. Trice parked one block away, then walked to the Jones' house and entered through a bedroom window on the northwest side of the house. Once inside, Trice severely beat Earnestine Jones with a set of nunchucks (a martial arts weapon comprised of two pieces of wood attached by a string or chain) and raped her. Ms. Jones, who was 5' 1" tall and weighed 105 pounds, suffered a fracture to one of her eye sockets, fractures to both her lower and upper jaw, neck injuries, a crushed rib cage, internal bruises to her heart and lungs, two broken fingers, extensive bruises in the genital area, and scratches in the vaginal

-2-

canal and cervix area. Although an autopsy suggested Ms. Jones likely survived for several hours after the attack, she ultimately died of the multiple blunt force injuries to her head, neck, and chest.

Trice, whose nunchucks broke during the attack on Ms. Jones, also assaulted Emanuel Jones with a hammer, puncturing his right eye, fracturing his right cheekbone, and fracturing his right forearm. Before leaving the Jones' residence, Trice stole approximately $500 in cash from Emanuel and threatened to kill him if he told anyone what happened.

Trice returned to his apartment at approximately 1:00 a.m. on Saturday, February 14. Landon, who had been sleeping on the couch, observed blood on Trice's coat and asked him what had happened. Trice said he "tore up" his nunchucks "on some homosexual's head." Trial Tr. at 635. Trice and Landon unwrapped the money, some of which was wrapped in pouches and some of which was wrapped in newspaper. Trice removed his clothes, wrapped them in his bloody coat, and left, saying he was going to burn them. After Trice returned, he and Landon proceeded to Landon's brother's apartment, where the three men spent the rest of the night drinking wine and ingesting cocaine purchased with the robbery proceeds.

Trice was subsequently arrested and charged in the District Court of Oklahoma County with four counts of criminal conduct arising out of his attack

on Earnestine and Emanuel Jones: one count of first-degree malice aforethought murder; one count of first-degree rape, after former conviction of two or more felonies; one count of assault and battery with a dangerous weapon, after former conviction of two or more felonies; and one count of first-degree burglary, after former conviction of two or more felonies.

The case was tried to a jury on June 8-12, 1987. At the conclusion of the guilt phase, the jury found Trice guilty of all four counts as charged. At the conclusion of the sentencing phase, the jury sentenced Trice to death on the first-degree murder charge, and 999 years imprisonment on each of the remaining charges.

Trice filed a direct appeal challenging his convictions and death sentence, asserting twenty-two propositions of error. On April 15, 1993, the Oklahoma Court of Criminal Appeals affirmed Trice's convictions and sentences. Trice v. State, 853 P.2d 203 (Okla. Crim. App. 1993) (Trice I). Trice's subsequent petition for writ of certiorari was denied by the United States Supreme Court on December 13, 1993. Trice v. Oklahoma, 510 U.S. 1025 (1993).

Trice filed an application for post-conviction relief with the trial court. On November 18, 1994, the trial court denied Trice's application. Trice appealed to the Court of Criminal Appeals. On February 29, 1996, the Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief. Trice v. State,

-4-

912 P.2d 349 (Okla. Crim. App. 1996) (Trice II). Trice filed his federal habeas petition on December 30, 1996. The district court denied relief on all grounds.

II.

*Applicability/retroactivity of AEDPA*

Trice contends the district court erred in applying the standards of review outlined in the Antiterrorism and Effective Death Penalty Act (AEDPA). Although Trice acknowledges his federal habeas petition was filed after the effective date of the AEDPA, he argues the standards of review set forth therein are inapplicable to his case because they would have an unconstitutional retroactive effect. According to Trice, his "entitlement to a federal evidentiary hearing and to plenary federal review vested when he pled fact based issues in state court and was denied a hearing and relief on the merits." Appellant's Opening Brief, at 17.

We are unpersuaded. We have repeatedly held that the "AEDPA applies to cases filed after its effective date, regardless of when state court proceedings occurred." Moore v. Gibson, ___ F.3d ___, 1999 WL 765893 at *7 (10th Cir. 1999); Rogers v. Gibson, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999). Although we have never addressed specifically the retroactivity arguments asserted by Trice, other circuits have uniformly rejected similar arguments. See, e.g., Mueller v. Angelone, 181 F.3d 557, 572 (4th Cir.) ("We thus conclude that petitioner has not

identified any new legal consequences that, had he known of them in advance, might have in any way affected his conduct before filing his federal habeas petition, and that he has identified no retroactive effect, impermissible or otherwise, under Landgraf [v. USI Film Products, 511 U.S. 244 (1994)]."), cert. denied, 1999 WL 720053 (1999); Graham v. Johnson, 168 F.3d 762, 781 (5th Cir. 1999) ("A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law."); Drinkard v. Johnson, 97 F.3d 751, 766 (5th Cir.1996) ("[Petitioner] cannot argue credibly that he would have proceeded any differently during his state post-conviction proceedings had he known at the time of those proceedings that the federal courts would not review claims adjudicated on the merits in the state court proceedings de novo."), cert. denied, 520 U.S. 1107 (1997). Because we agree with the analysis contained in those opinions, we proceed to outline and apply the AEDPA standards of review to Trice's petition.

*Standards of review*

Under the AEDPA,

a state prisoner will be entitled to federal habeas corpus relief only if he can establish that a claim adjudicated by the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." [28 U.S.C. § 2254(d).] Further, "a determination of a factual issue made by a State court shall be presumed to be correct." [Id.] § 2254(e)(1). That presumption of correctness is rebuttable only "by clear and convincing evidence." Id.

Boyd v. Ward, 179 F.3d 904, 911-12 (10th Cir. 1999). "If, however, a state court did not decide a claim on its merits and instead the federal district court decided the claim in the first instance, this court reviews the district court's conclusions of law de novo and factual findings, if any, for clear error." Wallace v. Ward, 191 F.3d at 1235, 1999 WL 705152 at *3 (10th Cir. 1999).

III.

*Denial of evidentiary hearing*

Trice contends the district court erred by not conducting an evidentiary hearing on his ineffective assistance of counsel claims. In Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998), we held that the AEDPA's restrictions on evidentiary hearings do not apply where a habeas petitioner has "diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so." Although Trice falls within this exception because he sought and was denied an evidentiary hearing in connection with his application for post-conviction relief, we conclude he is not entitled to an evidentiary hearing under pre-AEDPA standards because we can fully resolve his ineffective assistance of counsel claims on the record before us. See Foster v.

Ward, 182 F.3d 1177, 1184 (10th Cir. 1999).

*Ineffective assistance of trial counsel*

Trice contends his trial counsel was ineffective in several respects, all of which were allegedly prejudicial to him. To prevail on his claims of ineffective assistance, Trice must satisfy two requirements. First, he must demonstrate that his counsel's performance was constitutionally deficient, i.e., that it fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 688 (1984). To make this showing, Trice must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance [that] 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Second, Trice must demonstrate there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Kimmelman v. Morrison, 477 U.S. 365, 375 (1986); Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997).

### a. Lack of mental health expert

Trice contends his trial counsel "was rendered ineffective by the State's failure to provide [him with] adequate funds to obtain a competent psychological examination of [Trice] prior to trial." Appellant's Opening Brief, at 21.

Although Trice acknowledges the trial court granted his motion, he complains he was given only $750, enough only for his counsel to "retain a local psychologist." Id. at 22. According to Trice, had he been given more funding, his counsel could have "uncovered" what Trice describes as "significant mental health issues" that could have altered the outcome of the guilt and penalty phases of trial. Id.

Trice asserted this issue in his application for post-conviction relief. In rejecting it, the Court of Criminal Appeals stated:

> Assuming a defense attorney could actually be rendered ineffective by State action [i.e., the State's failure to provide sufficient funding], we find that Trice's defense attorneys' performance was well within the bounds of reasonably effective assistance. Viewing Trice's trial attorneys' conduct as of the time it occurred, we find they made professional, reasonable decisions; they applied for funds to help them determine Trice's mental condition; upon receiving the funds, they obtained a psychologist; and, after the psychologist evaluated Trice, they informed the court they would neither pursue an insanity defense nor present psychiatric testimony during the first stage of trial. These decisions did not fall below objective standards of reasonableness.

Trice II, 912 P.2d at 355.

To the extent Trice has asserted a legitimate claim of ineffective assistance[1], we conclude the Court of Criminal Appeals' resolution of that claim

---

[1] This appears to be more akin to an Ake v. Oklahoma, 470 U.S. 68 (1985) (denial of access to state-funded expert assistance) claim than an ineffective assistance claim. Even analyzing Trice's claims under the Ake framework, we conclude he is not entitled to habeas relief. In particular, we are unable to conclude that any of the mental health evidence he alleges should have been

(continued...)

-9-

represents a reasonable application of Strickland. The record indicates that trial

counsel sought and obtained funding to investigate a potential insanity defense.

The record further indicates that defense counsel made use of that funding by

hiring a mental health expert to examine Trice. Although the results of the

examination did not prove useful, that does not mean counsel's efforts were

constitutionally deficient. In any event, even assuming defense counsel should

have discovered the "significant mental health issues" cited by Trice, we are

unable to conclude that the presentation of those issues at trial would have altered

the outcome of either the guilt or punishment phase. Specifically, there is no

evidence that Trice was insane at the time of the crimes, or incompetent at the

time of trial. Nor are we persuaded that the evidence pertaining to his

psychological problems to which he now points would have been sufficient to

overcome the three aggravating factors found by the jury.

### b. Lack of adequate time to prepare

Trice complains his trial counsel had less than four months to prepare for

both stages of trial and suggests this amount of time was per se insufficient to

prepare for a capital murder case. According to Trice, his counsel "was unable to

---

[1](...continued)
discovered would have altered the outcome of either stage of trial had it been
presented.

investigate, to develop, and to present adequately substantial relevant mitigating evidence that could have convinced the jury to sentence [him] to life imprisonment." Appellant's Opening Brief, at 26.

Trice presented this issue to the Oklahoma courts in his application for post-conviction relief. The Court of Criminal Appeals rejected it on the following grounds:

> There is of course no hard and fast rule setting forth how much time an attorney needs to adequately prepare for a capital trial. Preparation time for this relatively uncomplicated case was probably less than in other cases in which the facts and circumstances give rise to more complex issues. For instance, Trice's confession to both charges obviated the need to investigate theories of innocence. The defense strategy on the murder charge was straightforward: Trice was under the influence of alcohol and PCP and thus could not form the specific intent to kill. After a physician examined Trice, his defense attorneys declared that they would neither present an insanity defense nor offer any psychiatric testimony during the first stage of trial. Given the uncomplicated facts of this case and the defense strategy, we fail to see how Trice's defense attorneys' failure to request a continuance and decision to proceed to trial fell below objective standards of reasonableness.

Trice II, 912 P.2d at 354-55.

We conclude the Court of Criminal Appeals' decision represents a reasonable application of Strickland. As the Court of Criminal Appeals correctly observed, four months was not necessarily an inadequate amount of time to prepare for trial in light of the relatively uncomplicated nature of the crime and the fact that Trice had confessed to the murder and rape. See, e.g., United States

-11-

v. Golub, 694 F.2d 207, 215 (10th Cir. 1982) (concluding one week was sufficient for experienced trial counsel to prepare a defense in a "relatively simple case."). Thus, Trice's counsel was not per se ineffective for failing to request and obtain a continuance. Even assuming, *arguendo*, Trice's counsel was ineffective for failing to request and obtain a continuance, there is no indication Trice was prejudiced thereby. In light of the nature of Trice's crimes, it is highly doubtful additional preparation time would have altered the outcome of either the guilt or sentencing phases of trial. Indeed, other than the additional mitigating evidence to which he now points, Trice does not explain what counsel could or should have done with additional preparation time.

### c. Concession of guilt

Trice complains that, during closing arguments, his trial counsel failed to challenge the rape charge and "told the jury . . . Trice was guilty of all of the counts in the information." Appellant's Opening Brief at 27. Trice also complains about a statement made by his counsel during second stage closing arguments that he "could think of a lot of things that could be said in support of giving Mr. Trice death." Id. at 28.

Trice raised part of this issue in his application for post-conviction relief. In particular, he alleged that counsel was "ineffective for failing to challenge his

-12-

rape charge and for conceding his guilt." Trice II, 912 P.2d at 355. It does not appear, however, that Trice challenged his counsel's statement during second stage closing arguments. In rejecting the issue actually raised by Trice, the Court of Criminal Appeals stated:

> Trice alleges . . . that his trial attorneys were ineffective for failing to challenge his rape charge and for conceding his guilt. He bases this claim on the fact that the forensic evidence against him was inconclusive. In light of the fact that Trice confessed to having raped the victim, we find that his trial attorneys' strategic decision to concede guilt was neither unreasonable nor prejudicial.

Id.

Again, we conclude the Court of Criminal Appeals reasonably applied Strickland in resolving this issue. It was uncontroverted that Trice was responsible for beating Ms. Jones and causing her death. Although Trice refused to confess on tape to raping Ms. Jones, he admitted to Detective Mullenix during questioning that he did, in fact, rape her. This "off-tape" confession was bolstered by the physical evidence presented at trial. In particular, the autopsy results indicated Ms. Jones had been raped at or near the time of her physical beating, and that the semen sample taken from her vagina by investigators was consistent with the blood type of Trice. Taken together, it was all but conceded that Trice raped Ms. Jones. Thus, we conclude it was an entirely reasonable strategy for Trice's trial counsel to concede this point and focus his efforts on persuading the jury that Trice did not have the intent to commit first-degree

-13-

murder, and/or persuading the jury to spare Trice's life.

*d. Failure to investigate and present additional mitigating evidence*

Trice contends his counsel was ineffective for failing to investigate and present mitigating evidence of his childhood and background, including: (1) records from his incarcerations in Oklahoma and Kansas demonstrating he did not have behavior problems in prison; (2) a certificate Trice received for participating in a program called "Prisoners Run Against Child Abuse," while incarcerated at the Crabtree Correctional Center; (3) evidence that he had been raped while incarcerated in a county jail at age sixteen; (4) the fact that he was the product of a rape (his father raped his mother when she was fourteen years old); (5) the difficult childbirth by his mother; (6) the fact that he met his father only once; (7) the fact that he was abused by his two stepfathers and two of his mother's boyfriends; (8) his difficulties in school and the fact that he only completed the sixth grade; (9) evidence he was sexually molested by a priest when he was in kindergarten and second grade; (10) the fact that he was sexually molested by a male adult (the neighbor of his maternal aunt) when he was approximately seven years old; (11) various head injuries suffered during childhood; (12) exposure to toxic chemicals during childhood; (13) involvement in a severe car accident at age twenty-three; (14) his long history of alcohol and drug abuse; (15) a

psychological exam conducted while in prison in the late 1970's, which indicated

he functioned in the "dull to low normal range of intelligence," was

unsophisticated, had poor judgment, was very gullible, and was easily talked into

doing things; and (16) a post-conviction psychological examination which

indicated he is dyslexic, functionally illiterate with an I.Q. of 79, suffers from

post traumatic stress disorder, and exhibits psychotic paranoid thought disorder.

Trice presented only the first three of these items to the Court of Criminal

Appeals in his application for post-conviction relief. In rejecting them, the Court

of Criminal Appeals concluded:

> Defense attorneys in this case called fourteen second stage
> witnesses, five of whom testified about the mental and physical abuse
> Trice suffered during his youth, at the hands of family and neighbors.
> Thus, the jury was informed that Trice had a painful upbringing. The
> fact that his trial attorneys did not present additional, potentially
> mitigating evidence concerning his prison experiences did not render
> their performance deficient. Further, Trice has failed to show that,
> had the jury been informed of these additional mitigating facts, it
> would have concluded that those facts outweighed evidence in
> aggravation.

Trice II, 912 P.2d at 355.

The question for us is whether the Court of Criminal Appeals' holding is a

reasonable application of Supreme Court precedent. In Kimmelman, the Supreme

Court noted that, "[b]ecause [the adversarial] testing process generally will not

function properly unless defense counsel has done some investigation into the

prosecution's case and into various defense strategies, . . . 'counsel has a duty to

-15-

make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" 477 U.S. at 384 (quoting Strickland, 466 U.S. at 691). Unquestionably, counsel's obligation to conduct reasonable investigations extends to matters related to the sentencing phase of trial. See Cooks v. Ward, 165 F.3d 1283, 1294 (10th Cir. 1998), cert. denied, 1999 WL 319436 (1999). "Indeed, we have recognized a need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case." Id. Ultimately, however, "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Kimmelman, 477 U.S. at 384 (quoting Strickland, 466 U.S. at 691).

Having reviewed the trial transcript, we conclude that the Court of Criminal Appeals' resolution of this issue is a reasonable application of Strickland and Kimmelman. It is true that Trice's trial counsel did not uncover every piece of mitigating evidence now cited by Trice and his habeas counsel. However, as the Court of Criminal Appeals aptly noted, Trice's trial counsel mounted a vigorous second stage defense, presenting numerous witnesses who testified about Trice's difficult childhood, his abuse at the hands of his stepfather, and the possibility that he may have been drunk and/or under the effects of PCP at the time of the crimes. Giving deference to the decisions made by trial counsel, we conclude his

-16-

performance was not constitutionally deficient.

Even assuming, *arguendo*, trial counsel's performance was constitutionally deficient, Trice cannot demonstrate that the outcome of the sentencing phase would have been different had counsel presented all of the evidence now cited by Trice. As described above, the underlying facts of Trice's crimes were horrific and Trice confessed to beating Emanuel Jones and murdering and raping Earnestine Jones. Based upon these facts and Trice's significant criminal history, the jury found the existence of multiple aggravating factors, all of which were supported by sufficient evidence. In light of these factors, we are unable to conclude the jury would have spared Trice's life had it been presented with all of the mitigating evidence Trice now outlines.

*Systematic exclusion of minorities from jury panel*

At the time of Trice's trial, the names of potential jurors were, in accordance with Oklahoma law (see Okla. Stat. tit. 38, § 18 (Supp. 1985)), gathered from a list of the active registered voters in Oklahoma County.[2] Prior to trial, Trice filed a motion challenging the composition of the jury pool. In

---

[2] Approximately four months after Trice's trial (October 1, 1987), Oklahoma changed its method of jury selection by requiring the names of potential jurors to be drawn from the list of registered drivers, rather than the list of registered voters.

-17-

particular, Trice argued the State's exclusive reliance on registered voters resulted in a systematic exclusion of African-Americans and other minorities from the jury pool in violation of his right, under the Sixth and Fourteenth Amendments, to a petit jury selected from a fair cross-section of the community. After conducting an evidentiary hearing on Trice's motion, the trial court denied the motion and proceeded with the trial. Although Trice reasserted the issue in his direct appeal, it was rejected on the merits by the Court of Criminal Appeals. Trice I, 853 P.2d at 208.

The Sixth Amendment requires that petit juries in criminal trials be "drawn from a fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 527 (1975). This does not guarantee that a petit jury will be "of any particular composition." Id. at 538. Instead, it requires only that the pools of names "from which [petit] juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id. at 538. In order to establish a prima facie violation of the Sixth Amendment "fair cross-section" requirement, a criminal defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).

-18-

In addressing this claim in Trice's direct appeal, the Court of Criminal Appeals correctly identified the controlling standard outlined in Duren. Trice I, 853 P.2d at 208. Without discussing the first or third elements of the prima facie test, the Court of Criminal Appeals concluded, after reviewing the evidence presented by Trice in support of his motion, that he had "failed to establish the representation of non-whites on the jury panel was not fair and reasonable in relation to the number of such persons found in the community." Id.

The question for this court, then, is whether the Court of Criminal Appeals' opinion represents a reasonable application of Duren. For the reasons outlined below, we answer this question in the affirmative.

Trice attempted to satisfy the second prong of the Duren prima facie test in the following manner. As a point of reference, Trice presented 1980 census data establishing the racial composition of Oklahoma County in general. This data indicated that whites comprised 82.49% of the county population; African-Americans, 12.35%; American Indians, 2.51%; Asians, .99%; and other nonwhite categories, 1.66%. Transcript of 6/5/87 hearing, at 5. Trice then sought to contrast these figures with the racial composition of the existing jury pool. However, no official figures were maintained regarding the racial composition of the jury pool, and the trial court denied Trice's request to distribute a

questionnaire to the jury pool members asking them to self-report their race.[3]

In a fallback approach, Trice then attempted to contrast the racial composition of the general population with the racial composition of registered voters. Because no official figures were maintained regarding the racial composition of registered voters in Oklahoma County, Trice attempted to determine these figures by offering into evidence "a map showing the eight voting wards of Oklahoma City, a map showing the various Oklahoma City voting precincts, and a census table showing the various tracts of Oklahoma County, including racial composition of residents." District Court Opinion, at 11 n.7. According to Trice, this evidence, considered together, demonstrated (1) that 67% of Oklahoma County's African-American population lived in two different voting wards (Wards Two and Seven), and (2) that the percentages of registered voters found within these two wards were lower than other wards within Oklahoma County.

Although Trice made a substantial effort to determine the racial

_____

[3] It does not appear that Trice has challenged in this court the trial court's refusal to allow him to submit questionnaires to the jury pool members. To the extent he has, there is no merit to that issue. As the district court noted, simply demonstrating the racial makeup of one jury pool does not demonstrate that Oklahoma County's use of registered voter lists resulted in a systematic exclusion of African-Americans or other minorities. See United States v. Ruiz-Castro, 92 F.3d 1519, 1527 (10th Cir. 1996) (concluding defendant failed to establish systematic exclusion of minorities based upon racial makeup of single venire); United States v. Edwards, 69 F.3d 419, 437 (10th Cir. 1995) (same).

composition of registered voters in Oklahoma County, his evidence was ultimately insufficient to allow the trial court to conclude that African-Americans were underrepresented in the list of registered voters. Indeed, as the district court noted, Trice's evidence could be reasonably interpreted to mean that African-Americans were not underrepresented in the list of registered voters. Of the eight wards in Oklahoma County, the two wards with the highest population of African-American citizens (Wards Two and Seven) had, respectively, the second and fourth highest percentages of registered voters (72% and 57.4%).[4] Based upon

_____

[4] The following table, compiled by the district court, highlights the percentage of registered voters per capita residing in each ward in Oklahoma County:

|            | Total Population | Registered Voters | % of Registered Voters |
|------------|------------------|-------------------|------------------------|
| Ward One   | 49,576           | 33,000            | 66.6                   |
| Ward Two   | 46,641           | 34,000            | 72                     |
| Ward Three | 49,765           | 27,000            | 54.3                   |
| Ward Four  | 51,375           | 21,700            | 42.2                   |
| Ward Five  | 49,579           | 23,300            | 47                     |
| Ward Six   | 51,240           | 25,600            | 50                     |
| Ward Seven | 51,025           | 29,300            | 57.4                   |
| Ward Eight | 51,012           | 50,700            | 99                     |

Although we question the accuracy of the number and percentage of registered voters in Ward Eight, both of which seem unrealistically high, the issue has not been presented before us. As the district court noted, Trice seemed to argue that, because Ward Eight had a higher percentage and overall number of registered voters than Wards Two and Seven, African-Americans must be underrepresented on the voter registration list. Although the data indicates that Ward Eight did, in fact, have a higher percentage and higher overall number of registered voters, it did not demonstrate that African-Americans were underrepresented when the

(continued...)

-21-

this evidence, we conclude the Court of Criminal Appeals' resolution of the issue

is not unreasonable or contrary to established Supreme Court precedent.

*Prosecutorial misconduct*

Trice contends the lead prosecutor in his case, Robert Macy, made a

number of improper comments during closing arguments in both stages of trial.

In particular, Trice points to the following comments made by Macy:

* attempting to evoke sympathy for the victims by repeatedly referring to Ms. Jones as "little-bitty" and "little";

* emphasizing Emanuel Jones was mentally retarded and small in stature;

* referring to the day of the crime, February 14, as Valentine's Day;

* telling the jury: "He [Trice] asked for mercy, where was mercy on February 14th?";

* referring to Trice as a "vicious, calculated, cold-blooded killer who preys on little people";

* arguing that Trice was "vicious, cruel, [and] totally without compassion" because he, "in the face of blood, in the face of hysteria, in the face of pain and screaming can become sexually aroused and perform a sexual act";

* arguing: "At that point in her [Ms. Jones'] life, to be violated like that, beaten, and left to die there in her own blood, while he is out snorting cocaine, sleeping in a clean bed every night, three good meals a day, visits from your family; is that adequate punishment? Ain't no way. No way it is.";

---

[4](...continued)
County was considered as a whole.

* injecting his own personal opinion by saying: "I hate those pictures [i.e., the pictures of Ms. Jones], and I'm not going to show them to you because I don't want to look at them myself."; and "I think that is about as heinous – I think you know from this evidence that is about as heinous, and atrocious as a crime can be."; "Ladies and gentleman, I submit to you under the evidence, if ever a man needed to die, he is sitting right there.";

* suggesting the jury owed Trice the death penalty by saying: "follow your duty in this case, to make the punishment fit this crime by returning a verdict of death.";

* maligning the character of Trice by telling the jury: "This man is unique because he is without compassion; he is without human feelings; he is without love for his fellow human beings. Thank God he is different. Because he is different, he sits where he sits.";

* aligning himself with the victim by saying: "Ladies and Gentlemen, today, June 12, 1987, ought to be Earnestine Jones' day, because it ought to be the day that this man is brought before the bar of justice and justice is meted out."

Appellant's Opening Brief, at 44-50. Trice further contends that Macy violated his Fifth Amendment right to remain silent when he commented on Trice's failure to call certain witnesses to corroborate his story that he was intoxicated on the night of the crimes. Finally, Trice contends Macy misstated the law to the jury during the sentencing phase when he argued: "[I]f the aggravating circumstances outweigh the mitigating circumstances, then death is the only appropriate punishment." Trial Tr. at 1071. According to Trice, this latter comment violated his constitutional right to have the jury consider mitigating evidence.

Trice raised all of these issues in his direct appeal. The Court of Criminal Appeals, though concerned about some of Macy's comments, concluded the

-23-

comments did not deprive Trice of any constitutional rights:

>Many of the comments [Trice] cites as error were not objected to at trial. In such instances this Court will review only for fundamental error. We find no such error. Most of the comments which were objected to at trial were reasonable comments on the evidence and do not constitute error. We agree that the prosecutor improperly attempted to evoke sympathy for the victim during second stage argument when he stated, "[h]e asked you for mercy. Where was mercy on February the 14th?" Defense counsel's objection to this comment should have been sustained, and the jury admonished to disregard it. Nor was it proper for the prosecutor to state "[l]adies and gentlemen, today, June 12th, 1987, [the date of the trial] ought to be Ernestine (sic) Jones' day . . . ." While these comments are not to be condoned, we do not believe that they were so grossly improper that, in the absence of additional error, reversal or modification would be warranted. .
>
>[Trice] contends it was improper for the prosecution to comment on the failure to call certain witnesses. During first stage closing argument the prosecutor, Mr. Macy, stated: "[B]oth Defense and the State have the power of subpoena. If Leroy Trice–if Eddie Leroy Trice was intoxicated that night, where are the witnesses that say he was intoxicated? Surely somebody saw him." This Court has held it is improper for the prosecution to insinuate that certain witnesses were not called by the defense because they would have proved damaging to the defendant's position. However, the general rule in Oklahoma is that where a person might be a material witness on a defendant's behalf and the accused neither places him on the stand nor accounts for his absence, failure to produce him as a witness is a legitimate matter for comment during the State's argument.. We do not find the above referenced comment to be improper.

Trice I, 853 P.2d at 214 (citations omitted).[5]

---

[5] In disposing of Trice's arguments, the Court of Criminal Appeals did not cite any federal law, but rather looked only to state law. Accordingly, it is questionable whether the standards of review set forth in § 2254(d)(1) apply.

(continued...)

Addressing Trice's arguments in reverse order, a review of the record does not support his contention that the prosecutor's comment about "death [being] the only appropriate punishment" violated his right to have the jury consider mitigating evidence. Although Trice cites Skipper v. South Carolina, 476 U.S. 1 (1986), that case holds only that a criminal defendant on trial for his life be "permitted to present any and all relevant mitigating evidence that is available." Id. at 8. Clearly, the prosecutor's comments in this case did not alter Trice's ability to present mitigating evidence to the jury. Moreover, it is not at all clear that the prosecutor was attempting to persuade the jury what the law was; rather, his comment appears to have been an attempt to persuade the jury not to be swayed by Trice's mitigating evidence. Finally, in view of the fact that the Court of Criminal Appeals engaged in a de novo reweighing of the aggravating factors and mitigating evidence on direct appeal, it is apparent that the prosecutor's comment was harmless.

Nor do we believe there is any constitutional error arising out of the prosecutor's comment regarding Trice's failure to call any witnesses to corroborate his claim of intoxication on the night of the crimes. Although a prosecutor may not comment on a defendant's decision to refrain from testifying,

---

[5](...continued)
Assuming *arguendo* those standards do not apply, we proceed to review Trice's arguments de novo.

-25-

see Griffin v. California, 380 U.S. 609, 615 (1965), he is otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony.[6] See United States v. Gomez-Olivas, 897 F.2d 500, 503 (10th Cir. 1990) ("As long as evidence can be solicited other than from the mouth of the accused, it is proper to comment upon the failure of the defense to produce it."). Here, it appears the prosecutor's comment was nothing more than an argument regarding the lack of corroboration for Trice's alleged intoxication. Because the comment was not aimed at Trice's failure to testify, we conclude it did not violate Trice's constitutional rights.

As for the remaining prosecutorial comments challenged by Trice, we conclude they did not, when considered alone or collectively, deprive Trice of his constitutional rights. Barring violation of a specific constitutional right, a prosecutor's improper comments or argument will require reversal of a state conviction only where they sufficiently infect the trial so as to make it fundamentally unfair and, therefore, a denial of due process. See Donnelly v. DeChristoforo, 416 U.S. 637, 643, 645 (1974); see also Darden v. Wainwright,

---

[6] The only exception, inapplicable here, is if the prosecution knows a particular witness would invoke the Fifth Amendment privilege if called to testify. Under such circumstances, the prosecution cannot remark upon the defendant's failure to call the witness. See United States v. Miller, 460 F.2d 582, 588 (10th Cir. 1972).

477 U.S. 168, 181 (1986). Inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings. See Donnelly, 416 U.S. at 643. Although some of the comments made by the prosecutor were perhaps inappropriate, they did not render either stage of Trice's trial unfair. Additionally, we note that counsel's failure to object to many of the comments at trial, see Trice I, 853 P.2d at 214, while not dispositive, is relevant to our assessment of fundamental unfairness. See Johnson v. Gibson, 169 F.3d 1239, 1249 (10th Cir. 1999). In light of the overwhelming evidence of Trice's guilt and the weight of the aggravating circumstances, there is no reasonable probability that the outcome would have been different without the alleged misconduct. Further, we note there is no evidence that the prosecutor's comments had any effect on the Court of Criminal Appeals' decision to impose the death penalty after reweighing the aggravating and mitigating evidence on direct appeal. Our conclusion that the comments at issue did not render the trial fundamentally unfair does not, however, amount to an endorsement of the comments, nor to a holding that they could never rise to the level of a due process violation absent the overwhelming evidence of guilt and aggravating circumstances present in this case.

*Voluntariness of confession*

Trice was arrested at approximately 3:35 a.m. on February 18, 1987. After he was transported to a holding facility at the police station, Detective Michael Burke began interviewing Trice at approximately 6:30 a.m. Without advising Trice of his rights, Burke obtained Trice's name and address, and the names of some of Trice's friends. Burke also questioned Trice regarding his whereabouts on Friday, February 13, 1987, and asked if he owned a pair of shoes recovered by police (the shoes that Trice had worn the night of the crimes). Burke denies saying anything to Trice regarding the homicide.

Between approximately 7:30 and 8:00 a.m., Detective Eric Mullenix arrived and began participating in the interview of Trice. Immediately after his arrival, Mullenix advised Trice of his *Miranda* rights. In response, Trice said he understood his rights and wished to talk to the detectives. Mullenix asked Trice to read an affidavit from Archie Landon, and played part of a tape recording of statements made by Landon. Toward the end of the tape recording, Trice told Mullenix to turn off the tape because he wanted to talk. Trice said he used to date Geraldine Jones, the daughter of Earnestine Jones and the sister of Emanuel Jones. Trice said he had heard that Geraldine's son, Moses, had been engaged in a homosexual relationship with Emanuel Jones. Because he had allegedly been molested by a homosexual individual and "severely disliked" homosexuals in

general, Trice said he went to Emanuel's house in the early morning hours of February 14, 1987, to "whip his ass." Trial Tr. at 522. According to Trice, Emanuel let him in the house and the two proceeded to Emanuel's bedroom, where Trice questioned Emanuel about his relationship with Moses. In response, Emanuel allegedly mumbled something and then slapped Trice. Trice said a woman (Ms. Jones) came out of the back bedroom and began hitting him (Trice) with a long, white object. According to Trice, he responded by pulling his nunchucks out of the rear waistband of his trousers and striking Emanuel and Earnestine Jones. Trice said the fight continued for a while, and he eventually picked up a pair of pants belonging to Emanuel (which contained money) and left through the back bedroom window.

At the conclusion of Trice's story (which also included details about returning to his apartment, counting the money, and disposing of his clothing), Mullenix asked him if he would be willing to have his statement tape-recorded. Trice agreed, but asked to first speak to a "district attorney." Trial Tr. at 526. Mullenix explained to Trice what a district attorney was; Trice still indicated a desire to talk to one. Accordingly, Mullenix contacted the DA's office and arranged for assistant DA Jay Farber to come and speak with Trice. When Farber arrived, Trice asked him some questions concerning drug and alcohol rehabilitation programs. Farber told Trice he would look into the matter. Trice

then proceeded to have his statement recorded. At the beginning of the tape recording, Mullenix again advised Trice of his *Miranda* rights. After Trice finished his tape-recorded statement in which he confessed to the beatings of both victims, Mullenix asked him if he had raped Earnestine Jones. Trice admitted raping Ms. Jones and said he had been drinking wine and ingesting PCP prior to the incident. Although Mullenix asked Trice if he would agree to have this admission tape recorded, Trice said he was tired and was not interested in doing so.

At trial, the State sought to introduce Trice's confession to Mullenix (both the tape-recorded confession to the beatings and the unrecorded confession to the rape). Because Trice claimed his confessions were obtained in violation of his rights, the trial court conducted an *in camera* hearing regarding the details of Trice's arrest, his transport to the police station, his interview, and his confessions. The police officers and detectives involved in the arrest, transport, and interview testified, as did Trice. At the conclusion of the hearing, the trial court found that Trice's confession "was voluntarily made," that Trice "effectively waived his right to counsel," and that Trice did not ask "for a lawyer." Trial Tr. at 596. The trial court denied Trice's motion to suppress. Id. During the guilt phase of trial, Trice's tape-recorded confession was admitted and Detective Mullenix testified about Trice's unrecorded confession to the rape.

On direct appeal, Trice claimed his confessions were improperly obtained by police and the trial court erred in admitting them. Trice I, 853 P.2d at 209. The Court of Criminal Appeals determined that the record from the *in camera* hearing "adequately support[ed] the trial court's conclusion that [Trice] did not request an attorney." Id. at 211. The Court of Criminal Appeals also rejected Trice's assertion that his request to speak to a "district attorney" was actually a request to speak to a defense attorney. Id. In particular, the Court of Criminal Appeals concluded there was "no evidence which supports [Trice's] claim that he mistakenly believed a district attorney would act on his behalf." Id. In addition, the Court of Criminal Appeals noted that when Trice spoke to assistant DA Farber, he "did not seek legal advice but rather inquired about the availability of drug and alcohol programs in prison." Id. Finally, although the Court of Criminal Appeals expressed "concern that [Trice] was questioned about the crime by Detective Burke prior to receiving his *Miranda* rights," it noted that "none of the statements made prior to [Trice] receiving the *Miranda* rights were introduced at trial," and concluded Trice's "unwarned statements did not taint the subsequent post *Miranda* confession." Id. at 212.

Trice contends the "procedures and tactics used by the Oklahoma City police to obtain [his] confession[s] were highly improper and rendered his statement[s] involuntary in violation of the Fifth Amendment." Appellant's

-31-

Opening Brief, at 55. More specifically, Trice contends his constitutional rights were violated "in three respects: 1) his right to remain silent was violated because the *Miranda* warnings were not read to him in a timely manner; 2) his right to counsel was not scrupulously honored; and 3) his right to due process was violated because the entire interrogation [by Burke and Mullenix] was not recorded electronically." Id.

Before addressing Trice's arguments, we must determine what standard of review to apply to the state courts' resolution of these arguments. Although the ultimate question of whether Trice's confessions were voluntary is a mixed question of law and fact, see Miller v. Fenton, 474 U.S. 104, 111-12, 115-16 (1985), subject to review under the standards set forth in § 2254(d)(1), any subsidiary factual findings made by the state trial court at the conclusion of the *in camera* hearing are entitled to a "presumption of correctness" under § 2254(e)(1). These could include findings "such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the Miranda warnings." Miller, 474 U.S. at 117.

At the conclusion of the suppression hearing, the trial court specifically found, as a matter of historical fact, that Trice did not ask to speak to a defense attorney prior to confessing to the crimes. In doing so, the trial court weighed the credibility of Trice's testimony that he asked to speak to both a district attorney

and a defense attorney against the testimony of police officers that Trice asked only to speak to a district attorney. The trial court's factual findings on this matter are entitled to a presumption of correctness under § 2254(e)(1), and Trice has not come forward with clear and convincing evidence to overcome this presumption.[7] Thus, in deciding the issues of law raised by Trice, we must proceed from the viewpoint that Trice asked to speak only to a district attorney.

Whether a confession was voluntary depends upon the "totality of the circumstances," including "the crucial element of police coercion," "the length of the interrogation" and "its continuity," "the defendant's maturity," "education," "physical condition," and "mental health," and "the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation." Withrow v. Williams, 507 U.S. 680, 693-94 (1993). Ultimately, the question is whether the confession was "the product of an essentially free and unconstrained choice." Culombe v. Connecticut, 367 U.S. 568, 602 (1961).

Having carefully reviewed the record on appeal, we conclude the Court of Criminal Appeals' determination that Trice's confessions were voluntarily made

---

[7] In light of Trice's long criminal history, it seems reasonable to conclude he understood the difference between a district attorney and a defense attorney. Further, the fact that he only questioned assistant DA Farber about the availability of drug and alcohol programs in prison suggests he knew precisely what he was asking.

is an entirely reasonable application of controlling Supreme Court precedent. Although Detective Burke failed to advise Trice of his *Miranda* rights prior to his initial questioning, that defect was remedied when Detective Mullenix returned to assist in the interview. At that point (which was well prior to the confessions), Mullenix advised Trice of his *Miranda* rights and Trice agreed to talk to the detectives. As for the details of the interrogation, there is no evidence that it was excessively long, or that Trice was in any other manner coerced into confessing. Finally, there is no indication that Trice's personal characteristics (e.g., maturity, mental health, physical health) in any manner affected the freedom of his decision to confess.

As for Trice's contention that the entire interrogation should have been electronically recorded, there is no Supreme Court precedent (or, for that matter, any other court precedent) supporting such a notion. Thus, he is not entitled to habeas relief under the AEDPA standards of review.

*Court of Criminal Appeals' reweighing of aggravating circumstances*

In deciding Trice's direct appeal, the Court of Criminal Appeals concluded the jury was given an unconstitutionally vague instruction on the "heinous, atrocious or cruel" aggravating factor. Trice I, 853 P.2d at 221. Accordingly, the Court of Criminal Appeals struck this aggravating factor and proceeded to

determine the validity of Trice's death sentence by reviewing the "remaining aggravating circumstances along with the mitigating evidence." Id. More specifically, the Court of Criminal Appeals proceeded to "determine what the jury in th[e] case would have decided had it not considered the invalid 'heinous, atrocious, or cruel' aggravator." Id.

After considering the evidence supporting the valid aggravating circumstances found by the jury and the mitigating evidence presented by Trice, the Court of Criminal Appeals determined "the sentence of death [was] factually substantiated and appropriate." Id. at 222. In doing so, the court noted that, "[w]hile ample evidence was presented to support the three valid aggravating circumstances, the proffered mitigating factors were relatively weak." Id. Further, the court emphasized that "very little of the State's closing argument was devoted to describing evidence of the failed 'heinous, atrocious, or cruel' aggravator." Id. Finally, the court concluded "the jury's improper consideration of [the 'heinous, atrocious, or cruel'] aggravator did not play a significant role in its decision to sentence [Trice] to death," and was "at most harmless error." Id.

Trice now contends the Court of Criminal Appeals failed to conduct a proper reweighing of the valid aggravating factors and the mitigating circumstances. In support of this contention, Trice cites a number of alleged failings on the part of the Court of Criminal Appeals. First, Trice contends the

-35-

court "failed to consider the role of the invalid aggravator on the jury's decision to sentence [him] to death." Appellant's Opening Brief, at 66. Second, Trice contends the court was "unable to conduct a thorough analysis of all relevant mitigating evidence . . . due to the ineffective assistance of trial counsel." Id. at 66-67. Third, Trice complains the court "downplayed the mitigation presented at the trial and miscast the aggravating evidence when it determined [Emanuel Jones] was 'severely' beaten." Id. at 67. Fourth, Trice contends the weighing process "was skewed by the consideration of two aggravating circumstances supported by the same evidence." Id. at 68. Fifth, Trice contends the court's method of harmless error analysis was insufficient under the Eighth Amendment. Id. Finally, Trice contends the court was mistaken in concluding that the prosecutor's closing arguments did not focus heavily on the invalid "heinous, atrocious, and cruel" aggravator. Id.

The threshold question is whether these arguments were presented to the Oklahoma courts. In his direct appeal, Trice, apparently in anticipation of the possibility the Court of Criminal Appeals might strike the "heinous, atrocious, and cruel" aggravator, argued the court lacked authority to reweigh the aggravating and mitigating circumstances because doing so would improperly usurp the jury's function and violate the state and federal constitutional prohibitions against ex post facto laws (both of these arguments were rejected by

the Court of Criminal Appeals).  As far as we can tell from the record, however, Trice did not present any of the issues now asserted in his federal habeas petition, either via a petition for rehearing[8] or in his application for post-conviction relief. Thus, these claims are unexhausted and should not be addressed on federal habeas review.  See 28 U.S.C. § 2254(b)(1)(A).

Even assuming, *arguendo*, that Trice properly exhausted these claims, we find no merit to them.  Most of the issues are simply extensions of the other substantive issues asserted by Trice in his habeas petition, none of which have any merit.  As for Trice's contention that the Court of Criminal Appeals failed to consider the role of the invalid "heinous, atrocious, and cruel" aggravator on the jury's decision to sentence him to death, it is also without merit.

In Clemons v. Mississippi, 494 U.S. 738 (1990), the Supreme Court held that nothing in the Constitution requires that a jury impose the sentence of death or make the findings prerequisite to imposition of such a sentence.  Id. at 745. Accordingly, the Court concluded that a defendant's constitutional rights are not "infringed where an appellate court invalidates one of two or more aggravating circumstances found by the jury, but affirms the death sentence after itself finding that the one or more valid remaining aggravating factors outweigh the mitigating

---

[8]  Although there is an indication in the record that Trice filed a petition for rehearing after the Court of Criminal Appeals rejected his direct appeal, we do not have a copy of that petition in the record.

evidence." Id. at 745. In light of Clemons, it is apparent that the Court of Criminal Appeals' decision to reweigh the aggravating and mitigating evidence did not violate Trice's constitutional rights.

As for the Court of Criminal Appeals' ultimate decision to affirm the death sentence, we conclude it is fully supported by the record. It was uncontroverted that Trice had a past record of violent felonies. Further, by severely beating two people, one of whom died and the other of whom sustained life-threatening injuries, Trice clearly created a great risk of death to more than one person. Considering all of the evidence presented at the sentencing phase, including Trice's past history of violence, the gruesome facts of the crimes at issue, and his history of drug and alcohol abuse, it was entirely reasonable to conclude that Trice represented a continuing threat to society. Although there was certainly mitigating evidence, particularly with regard to Trice's childhood treatment at the hands of his stepfather, that evidence was insufficient to outweigh the aggravating circumstances.

Finally, Trice's assertion that the Court of Criminal Appeals' harmless error analysis was improper is also without merit. In Clemons, the Supreme Court held that even if state law prevented a state appellate court from reweighing aggravating and mitigating circumstances, the state appellate court could apply harmless error analysis in reviewing a death sentence imposed in reliance on an

improper aggravating factor. 494 U.S. at 752. The Court indicated that it is proper for a state appellate court to "examine the balance struck by the [sentencing body] and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance." Id. at 753. A reading of the Court of Criminal Appeals' decision in Trice's case indicates the court "covered both bases" by first reweighing the aggravating and mitigating circumstances, and then engaging in harmless error analysis. Under Clemons, it was unnecessary for it to have done both. Because its reweighing of factors was proper, any deficiencies in its harmless error analysis are essentially irrelevant. In any event, a review of the record demonstrates that it is beyond a reasonable doubt that the result of the sentencing phase would have been the same if the improper aggravating factor had been eliminated entirely.

*Use of unconstitutional aggravating factors*

Trice challenges the aggravating factors found by the jury on several grounds. In particular, Trice contends (1) the continuing threat aggravating factor is unconstitutional because it is overbroad and does not legitimately narrow the class of persons eligible for death, (2) the evidence presented at trial was insufficient to support the jury's finding of the "great risk of death" aggravating factor, and (3) the State improperly relied on his past criminal record to prove

both the "prior conviction of violent felonies" and the "continuing threat" aggravating factors.  These arguments will be addressed in order.

### a.  Continuing threat

Trice's challenges to the continuing threat aggravating factor are foreclosed by several recent habeas cases from this circuit, all of which agree that the continuing threat aggravator as applied in the Oklahoma sentencing scheme does not violate the Eighth Amendment.  Ross v. Ward, 165 F.3d 793, 800 (10th Cir.), cert. denied, 1999 WL 496228 (1999); Castro v. Ward, 138 F.3d 810, 816 (10th Cir.), cert. denied, 119 S. Ct. 422 (1998); Nguyen v. Reynolds, 131 F.3d 1340, 1352-54 (10th Cir. 1997), cert. denied, 119 S. Ct. 128 (1998).  Obviously, this panel is not free to deviate from these prior panel decisions.  See Foster, 182 F.3d at 1194.

### b.  Great risk of death

Trice contends the evidence presented during the sentencing phase of trial was insufficient to support the jury's finding that he knowingly caused a great risk of death to more than one person.  Before addressing the merits of this contention, it must be noted that it is not altogether clear that Trice presented this specific issue to the Oklahoma courts.  In his direct appeal, Trice challenged the

constitutionality of the "great risk of death" aggravator. In doing so, he argued there was no evidence that he made an overt attempt to kill Emanuel Jones. Trice's Direct Appeal Brief, at 72. He did not, however, raise this as a separate issue; thus, the Court of Criminal Appeals did not treat it as such.

Assuming *arguendo* the issue was properly raised and exhausted in the state courts, there is no merit to it. It was uncontroverted that Trice caused the death of Earnestine Jones. In addition, the evidence presented during the sentencing phase of trial (which incorporated the evidence presented during the guilt phase) demonstrated that Trice's conduct also exposed Emanuel Jones to the possibility of death. Dr. Joseph Alvarez, the physician who treated Emanuel Jones after the assault, testified that the injuries sustained by Emanuel (i.e., perforation to the globe of his right eye, fracture to the outer right cheekbone, and a fracture of the right forearm) would have been life threatening when considered as a whole. Trial Tr. at 936. This testimony, when combined with the nature of the attack, would have allowed the jury to reasonably infer that Trice knowingly created a great risk of death to Emanuel Jones.

### b. *Double counting of aggravating factors*

Trice contends his constitutional rights were violated because the same criminal conduct (i.e., his record of prior felony convictions) was used by the

State to support both the "continuing threat" aggravator and the "prior conviction of violent felonies" aggravator.  In disposing of Trice's direct appeal, the Court of Criminal Appeals rejected this argument:

> This Court squarely addressed [the identical] contention in the recent case of Smith v. State, 819 P.2d 270, 278 (Okl. Cr. 1991), cert. denied, 504 U.S. 959, 112 S. Ct. 2312, 119 L. Ed. 2d 232 (1992). The defendant in Smith argued, as [Trice] does now, that the same evidence–namely, prior violent felony convictions–was presented to the jury in support of both the "prior violent felony conviction" and "continuing threat" aggravating circumstances.  We upheld the finding of both aggravators in Smith, reasoning that each of the aggravators alleged were presented to and in fact did show different aspects of "the individual offense and the individual offender . . . ." (citations omitted). * * *
> We find Smith to be dispositive. [Trice] correctly asserts the State, in its Notice of Evidence of Aggravation to be Offered in Support of the Death Penalty, listed his prior rape conviction in support of both the "prior violent felony" and "continuing threat" aggravators.  What [Trice] fails to mention, however, is that the State also alleged and argued the following evidence in support of the "continuing threat" aggravating circumstance: the brutal nature of the killing; four (4) prior felony convictions; [Trice's] skill in handling nunchakus, and habit of carrying them and a knife with him; and, [Trice's] actions after the killing, including boasting about the crime and using money obtained from the victims to purchase illegal drugs. These separate and distinct aggravators, presented to show different aspects of [Trice] and his crime, were each clearly supported by independent, admissible evidence.

Trice I, 853 P.2d at 220.

Although Trice has reasserted this claim in his federal habeas petition, he cites no Supreme Court cases in support of it.  Instead, he relies primarily on a case from this circuit, United States v. McCullah, 76 F.3d 1087 (10th Cir. 1996),

cert. denied, 520 U.S. 1213 (1997). In McCullah, this court held that "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." Id. at 1111.

Assuming *arguendo* the new AEDPA standards allow Trice to rely on McCullah as a basis for federal habeas relief, it is apparent the jury in Trice's case did not "double count" aggravating factors. As the Court of Criminal Appeals noted, the two aggravating factors at issue focused on different aspects of Trice and his crime. The "prior conviction of a violent felony" aggravator focused solely on Trice's past violent behavior. In particular, it focused narrowly on whether Trice's past crimes involved the use or threat of violence to the person, which they unquestionably did. In contrast, the "continuing threat" aggravator focused forward and was essentially a prediction of whether Trice was likely to engage in violent criminal behavior in the future. Although this factor was undoubtedly based in part on Trice's previous crimes, it arguably focused on different aspects of those crimes than did the "prior violent felony" factor (e.g., whether any aspects of Trice's prior crimes suggested that he was likely to engage in future violent behavior). Moreover, the continuing threat aggravator was also based on other facts as well, including those specifically listed by the Court of Criminal Appeals.

IV.

The judgment of the district court is AFFIRMED.