PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 3 2001**

**PATRICK FISHER**
**Clerk**

BILLY RAY BATTENFIELD,

Petitioner-Appellant,

v.

GARY L. GIBSON, Warden,
Oklahoma State Penitentiary,

Respondent-Appellee.

No. 99-7096

Appeal from United States District Court
for the Eastern District of Oklahoma
(D.C. No. 98-CV-36-B)

Robert W. Jackson (Steven M. Presson with him on the brief), Jackson & Presson,
P.C., Norman, Oklahoma, for the appellant.

Seth S. Branham, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General, with him on the brief), Oklahoma City, Oklahoma, for the appellee.

Before **KELLY**, **BRISCOE**, and **LUCERO**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Petitioner Billy Ray Battenfield, an Oklahoma state prisoner convicted of

first degree murder and sentenced to death, appeals the district court's denial of

his 28 U.S.C. § 2254 petition for writ of habeas corpus. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and reverse and remand with instructions to grant the writ as to Battenfield's death sentence, subject to the state district court conducting a new sentencing trial or vacating Battenfield's death sentence and imposing a lesser sentence consistent with law.

I.

On the evening of April 22, 1984, Battenfield and his girlfriend Virginia Jackson, accompanied by Jackson's sixteen-year-old son B.G., went to the 108 Club in Muskogee, Oklahoma, and joined a group of people consisting of Donald Cantrell, brothers William and Robert Bechtol, Robert Bechtol's daughter Linda Bechtol, her common-law husband Melvin Battiest, and Grace Alford. Cantrell used money from a bank bag to purchase beer for several people in the group. At approximately 10:00 p.m., most of the group decided to continue their partying at nearby Fort Gibson Lake. Battenfield, Battiest, and Cantrell left in Cantrell's truck, with Cantrell driving. Jackson, B.G., Alford, and Linda Bechtol followed in Battenfield's car.

The group stopped at a convenience store to purchase more beer and then drove to an area of the lake known as Wahoo Bay. Battenfield, Battiest, and Cantrell got out of the truck and stood outside drinking beer. Cantrell walked to the passenger side of Battenfield's car and encouraged the occupants to get out

and join the party, but they declined because it was cold. Battenfield walked to the driver's side of the car and spoke to Jackson, who handed something to Battenfield. Battenfield walked to the rear of the car, apparently opened and closed the trunk, and then returned to the driver's side of the car and handed something to Jackson. There is also evidence that at this approximate time, Battiest approached the passenger side of the car and briefly spoke to Bechtol. Shortly thereafter, the occupants of the car drove some distance away from the truck to restroom facilities. Alford and Bechtol spent approximately ten minutes inside the restroom. After they returned to the car, the occupants sat in the car for approximately five minutes before slowly driving toward the truck, stopping once on the way for another ten to fifteen minutes.

There is conflicting evidence concerning what transpired when the occupants of the car returned. Jackson testified that she observed Battenfield standing beside the truck, but did not see Battiest or Cantrell. Bechtol testified that she observed Battiest standing by the truck, but did not see Battenfield or Cantrell. According to Alford, none of the men were in sight when they first returned to the truck. All of the occupants of the car agreed that, after approximately five to ten minutes, Battenfield came running toward the car and told Jackson: "We're going to Tulsa. Take her [Alford] home. He [Cantrell] passed out." Tr. at 1164. Battenfield and Battiest got into Cantrell's truck, with

3

Battenfield on the driver's side. Cantrell was not in sight.

On the way back to Muskogee, the vehicles stopped at a convenience store where Battenfield purchased gasoline for both vehicles and either Bechtol or Battiest purchased some beer (neither of these two individuals had money prior to driving to Wahoo Bay). After dropping off Alford, Bechtol, and Battiest at their homes, Battenfield, Jackson and B.G. left Muskogee, with Battenfield again driving Cantrell's truck and Jackson again driving the car. They stopped at another convenience store and B.G., at Battenfield's direction, purchased one dollar's worth of gasoline in a jug. They then drove to Broken Arrow, Oklahoma, where Battenfield abandoned Cantrell's truck and, using the gasoline from the jug, set the truck on fire. The car broke down on the way back to Muskogee and a highway patrol officer helped Battenfield jump-start the car.

Cantrell's body was found the next day at Wahoo Bay. According to the autopsy results, Cantrell sustained at least three blunt-force injuries to the head and chest, consistent with blows from a stick, brick, rock, foot, or tire iron. An injury to the left side of his forehead caused multiple fractures to Cantrell's skull bone, as well as bruising and subsequent hemorrhaging of his brain. According to the forensic pathologist who performed the autopsy, the injury would likely have rendered Cantrell unconscious. An injury to the right side of Cantrell's back involved multiple rib fractures and a punctured lung. The autopsy results indicate

4

Cantrell likely died within minutes of sustaining this latter injury. The autopsy results also indicated Cantrell suffered various post-mortem abrasions (perhaps from being dragged along the ground from one area to another).

The highway patrol officer who helped Battenfield jump-start the car testified that Battenfield was wearing Cantrell's coat. On April 23, 1984, Battenfield was again observed wearing Cantrell's coat, and he allegedly admitted to B.G. that he hit Cantrell one time on the head with a tire iron. Battenfield was arrested for the murder of Cantrell on April 24, 1984. Hairs from Cantrell's head were found on Battenfield's jeans and stocking cap (both of which Battenfield was wearing on the night of the murder).

Battenfield's jury trial began on February 25, 1985. Battenfield did not testify or present any evidence in his defense. The jury was instructed on the lesser included offenses of second degree murder and first degree manslaughter, but found Battenfield guilty of first degree murder. The state asserted the existence of four aggravating factors in the second stage of trial: (1) Battenfield's previous felony conviction involved the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder and the destruction of Cantrell's truck were effected for the purpose of avoiding or preventing lawful arrest or prosecution; and (4) there was a probability that Battenfield would constitute a continuing threat to society. The state incorporated

5

by reference the evidence presented during the first stage of trial. The only additional evidence presented by the prosecution was a copy of a judgment outlining a previous conviction in 1978 for assault and battery with a deadly weapon. Battenfield presented no evidence in mitigation. After deliberating for approximately one hour and forty-five minutes, the jury fixed Battenfield's sentence at death. In doing so, the jury found the existence of two aggravating factors: (1) the murder was heinous, atrocious, or cruel, and (2) Battenfield was a continuing threat to society. On March 19, 1985, the trial court formally sentenced Battenfield to death.[1]

Battenfield, represented by new counsel, filed a direct appeal asserting twelve propositions of error. The Oklahoma Court of Criminal Appeals (OCCA) affirmed Battenfield's conviction and sentence. Battenfield v. State, 816 P.2d 555 (Okla. Crim. App. 1991) (Battenfield I), cert. denied, 519 U.S. 839 (1996). In doing so, the OCCA found there was insufficient evidence to support the jury's finding that the murder was especially heinous, atrocious, or cruel. However, after reweighing the remaining valid aggravating factor (the continuing threat

---

[1] Battiest was also charged, tried, and convicted for the first-degree murder of Cantrell. He received a life sentence. His conviction and sentence were affirmed on direct appeal by the OCCA. Battiest v. State, 755 P.2d 688 (Okla. Crim. App. 1988). Although Battiest apparently confessed to the murder, the details of that confession are not outlined in the OCCA's opinion, and it remains unclear precisely what role each of the co-defendants (Battenfield and Battiest) played in the death of Cantrell.

6

factor) against the mitigating evidence, the OCCA affirmed Battenfield's death sentence. Battenfield's petition for rehearing was denied. Battenfield v. State, 826 P.2d 612 (Okla. Crim. App. 1991) (Battenfield II). Battenfield's petition for writ of certiorari was denied on March 23, 1992. Battenfield v. Oklahoma, 503 U.S. 943 (1992).

On February 14, 1995, Battenfield filed an application for post-conviction relief with the state trial court, asserting twelve grounds for relief. In November and December 1996, the court conducted an evidentiary hearing on two of the issues asserted by Battenfield, including his claim that his trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase of trial. The court ultimately denied the application for post-conviction relief on May 13, 1997. Battenfield's appeal of the decision was denied on January 21, 1998. Battenfield v. State, 953 P.2d 1123 (Okla. Crim. App. 1998) (Battenfield III).

In February 1996, Battenfield filed a motion in federal district court requesting appointment of counsel to represent him in a federal habeas proceeding and seeking authorization for legal research expenses. Nearly two years later, on January 26, 1998, Battenfield filed a second motion for appointment of counsel.[2]

_____

[2] Neither motion is included in the record on appeal. According to the district court's docket sheet, the case was considered "filed" as of January 26,

(continued...)

7

The motions were granted on February 9, 1998, and Battenfield's petition for writ of habeas corpus was filed on June 15, 1998. On May 5, 1999, the district court denied Battenfield's petition. Pursuant to Battenfield's request, the district court granted him a certificate of appealability (COA) with respect to four issues: (1) ineffective assistance of trial counsel during the second stage proceedings; (2) improper removal of a venire person by the trial court for cause; (3) prosecutorial misconduct; and (4) cumulative assessment of any of these errors. This court has granted a COA on an additional issue: whether the evidence presented at trial was sufficient to prove that Battenfield was a continuing threat to society.

II.

Because Battenfield's federal habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by the provisions of the AEDPA. Wallace v. Ward, 191 F.3d 1235, 1240 (10th Cir. 1999), cert. denied, 120 S. Ct. 222 (2000). Under the AEDPA, the appropriate standard of review for a particular claim hinges on the treatment of that claim by the state courts. If a claim was not decided on the merits by the state courts (and is not otherwise procedurally barred), we may exercise our independent judgment in deciding the claim. See LaFevers v. Gibson, 182 F.3d

_____

[2](...continued)
1998.

8

705, 711 (10th Cir. 1999). In doing so, we review the federal district court's conclusions of law de novo and its findings of fact, if any, for clear error. Id. If a claim was adjudicated on its merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). "Thus, we may grant the writ if we find the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law; decided the case differently than the Supreme Court has on a set of materially indistinguishable facts; or unreasonably applied the governing legal principle to the facts of the prisoner's case." Van Woudenberg v. Gibson, 211 F.3d 560, 566 (10th Cir. 2000) (citing Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000)).

## III.

*Improper removal of a venire person by the trial court for cause*

Battenfield alleges the trial court violated his Sixth and Fourteenth Amendment right to trial by an impartial jury when it excused for cause a venire member who stated in response to voir dire questioning by the trial court that he could not impose the death penalty "without doing violence to his conscience."

9

Tr. at 37.

In <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968), the Supreme Court held that a state "infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all those members of the venire who express conscientious objections to capital punishment." <u>See</u> <u>Wainwright v. Witt</u>, 469 U.S. 412, 416 (1985). The Court also recognized a "State's legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme." <u>Id.</u> Balancing these interests, the Court has held "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Id.</u> at 420. In applying this standard, a venire member's bias need not "be proved with 'unmistakable clarity.'" <u>Id.</u> at 424. Rather, it is sufficient if "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." <u>Id.</u> at 426. A trial judge's determination of a venire member's bias under this standard is a factual finding entitled to a presumption of correctness. <u>See</u> <u>id.</u> at 428-29 (pre-AEDPA case); <u>Moore v. Gibson</u>, 195 F.3d 1152, 1168 (10th Cir. 1999) (AEDPA case), <u>cert. denied</u>, 120 S. Ct. 2206 (2000).

10

Here, the trial court asked each potential juror the following question: "If selected as a juror in a case where the law and the evidence warrants, could you, without doing violence to your [conscience], recommend the death penalty?" Tr. at 24. All of the venire members except Robert Elliott answered in the affirmative. The following colloquy occurred between the trial court and Elliott:

> THE COURT: Sir, you understand that the Defendant is charged with Murder in the First Degree. The law provides that a person convicted of Murder in the First Degree shall be punished by death or by imprisonment for life. It is your duty to determine whether the Defendant is not guilty or guilty of Murder in the First Degree. If you find the Defendant guilty of Murder in the First Degree, your duty is to determine whether or not, considering the evidence, you should recommend death. If selected as a juror in a case where the law and the evidence warrants, could you, without doing violence to your [conscience], recommend the death penalty?
> MR. ELLIOTT: No, sir.
> THE COURT: You understand that if the evidence is such, and what this instruction is saying, that if the law says that it's to be considered one way or the other, your statement is that you just can't consider the death penalty at all?
> MR. ELLIOTT: Yes, sir.

Id. at 37-38. Based upon this discussion, the following proceedings were conducted outside the hearing of the prospective jurors:

> THE COURT: You move for cause?
> MR. SPERLING [the prosecutor]: (Nods his head in the affirmative.)
> THE COURT: You want to make a record?
> MR. SHOOK [defense counsel]: Your Honor, we would object and request that we be allowed to voir dire the witness concerning his ability.
> THE COURT: You may. Mr. Shook, I will allow you to ask a few voir dire questions.

11

<u>Id.</u> at 38. The following proceedings then occurred:

> MR. SHOOK: Mr. Elliott, to begin with I'm sorry but I didn't catch your address where you live.
>
> MR. ELLIOTT: Coweta.
>
> THE COURT: Now, if you wish, just ask as to the question that was asked by the Court. I'm not just tendering the prospective juror for just general voir dire questions. It has to do with the question that was asked by the Court.
>
> MR. SHOOK: I will, Your Honor.
>
> THE COURT: Okay.
>
> MR. SHOOK: Do you understand, sir, that you will receive a set of instructions, if the trial gets to a second stage, if you would find the Defendant guilty of Murder in the First Degree, there are alternative forms of punishment. Did you understand that?
>
> MR. ELIOTT: Yes, sir.
>
> MR. SHOOK: One of those alternatives being life in prison, one of those alternatives being the death penalty?
>
> MR. ELLIOTT: Yes, sir.
>
> MR. SHOOK: Now, you understand that the instructions are the law that you're to apply in this case?
>
> MR. ELLIOTT: Yes, sir.
>
> MR. SHOOK: Okay. Can you consider the law that the Court submits to you?
>
> MR. ELLIOTT: Yes, sir.
>
> MR. SHOOK: Okay. Can you consider alternative forms of punishment that the Court instructs you on?
>
> MR. ELLIOTT: Yes, sir.
>
> MR. SHOOK: Can you follow that instruction? Can you follow the law where the facts warrant them?
>
> MR. ELLIOTT: Yes, sir.
>
> MR. SHOOK: Okay. Knowing that, can you consider the death penalty as an alternative to punishment if you're so instructed?
>
> MR. ELLIOTT: I don't know if I understand. If the law says death, and I would agree with that, or –
>
> MR. SHOOK: No. Can you consider the instruction on the death penalty that the Court may or may not submit?
>
> MR. ELLIOTT: I could consider it, yes.
>
> MR. SHOOK: Okay. Nothing further.
>
> THE COURT: Any questions?

12

MR. SPERLING: None, Your Honor.

THE COURT: My question to you again is: Sir, if you find the Defendant guilty of Murder in the First Degree, your duty is to determine whether or not, considering the evidence, you should recommend death. If selected as a juror in a case where the law and the evidence warrants–that's just what Mr. Shook asked–could you, without doing violence to your [conscience], recommend the death penalty?

MR. ELLIOTT: No, sir, I couldn't.

THE COURT: You may step down for cause. Exception allowed to the Defendant.

Id. at 38-40.

On direct appeal, Battenfield asserted that the trial court erred by striking Elliott from the jury panel. The OCCA rejected this assertion on the following grounds:

We agree with [Battenfield's] counsel that trial judges should avoid asking a potential juror whether he or she could recommend the death penalty "without doing violence to your conscience." The use of such terms is at best confusing. While the trial judge's question to Elliott "may not have been ideal, we cannot conclude that it was inconsistent with the 'substantial impairment' test articulated in Witt." Despite the trial judge's use of the confusing phrase "without doing violence to your conscience," he inquired further into the depth of Elliott's convictions by asking whether Elliott's position was that he could not "consider the death penalty at all?" to which Elliott responded, "Yes, sir." We recognize that "not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." However, at no point in time did Mr. Elliott state, nor was he asked by defense counsel, whether he could temporarily set aside his personal beliefs in deference to the law and recommend the death penalty where appropriate under the facts and the law. Considering the entire record surrounding Elliott's exclusion,

13

including trial counsel's attempted rehabilitation, and giving appropriate deference to the trial judge, we hold that Elliott's responses "sufficiently demonstrated that his beliefs about capital punishment would 'substantially impair' his ability to serve as a juror."

Battenfield I , 816 P.2d at 559 (internal citations omitted).

We previously have addressed the striking of venire members based upon questions and answers similar to those employed here. In Coleman v. Brown, 802 F.2d 1227 (10th Cir. 1986), the state trial court excused a prospective juror for cause based upon his answers to questions:

> Court: [I]f you were sitting on a jury and in a case where the law and the evidence warranted and you were told it was a proper case to consider the death penalty, could you, if you felt it was proper, agree to a death penalty . . . without doing violence to your own conscience?
> Juror: No, I don't think I could.
> Court: In other words, you're telling me that if you find beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree and if under the law and the evidence and all the circumstances you could consider a death penalty, you tell me that you have such reservations that you just simply could under no circumstances impose a death penalty upon another human being?
> Juror: I don't think I could, no.

Id. at 1232. Applying the standard announced by the Supreme Court in Witt, we found "no grounds for overturning the trial judge's decision." Id.

Similarly, in Davis v. Maynard, 869 F.2d 1401, 1408 (10th Cir. 1989), vacated on other grounds sub nom. Saffle v. Davis, 494 U.S. 1050 (1990), the state trial court asked each potential juror the following question: "In a case

14

where the law and evidence warrant, in a proper case, could you, without doing violence to your conscience, agree to a verdict imposing the Death Penalty?" If a venire member did not answer "yes," the trial court asked:

> If you found beyond a reasonable doubt that the Defendant in this case was guilty of Murder in the First Degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the Death Penalty such that regardless of the law, the facts and the circumstances of the case, you would not inflict the Death Penalty?

Id. We characterized the voir dire as "troublesome," noting the trial court's "first question to the venire members [wa]s of little relevance," and the second question, "while a better attempt to incorporate the proper standard, [wa]s confusing, and . . . invite[d] ambiguous answers." Id. Nevertheless, affording the trial court's findings a presumption of correctness, we concluded that the trial court "properly found the challenged venire members' view likely to 'prevent or substantially impair' the performance of their duties as jurors." Id. at 1409.

Like the state trial courts' factual findings at issue in Davis and Coleman, the trial court's finding of bias on the part of Elliott is entitled to a presumption of correctness.[3] See 28 U.S.C. § 2254(e)(1). The issue is whether Battenfield has

---

[3] Battenfield argues that "this case does not turn on the trial court's factual determinations, but on the legal standard it applied." Battenfield's Opening Brief at 21. What he fails to acknowledge, however, is that the trial court ultimately made a factual determination that Elliott was biased, and it is that factual determination we are called upon to review in this federal habeas case. The fact
(continued...)

15

met his burden of rebutting this presumption by clear and convincing evidence. Id. It is true, as argued by Battenfield, that the trial court's first and last questions to Elliott were inconsistent with the standard announced in Witt and therefore must be considered "of little relevance." Davis, 869 F.2d at 1408. If these were the only questions posed to Elliott, there might be a basis for rejecting the trial court's finding of bias. However, the trial court's second question to Elliott ("[Y]our statement is that you just can't consider the death penalty at all?"), and Elliott's response ("Yes, sir."), provide a sufficient basis for the trial court's finding that Elliott was biased. Defense counsel's follow-up questioning, although apparently aimed at rehabilitating Elliott, did little to demonstrate that Elliott could "faithfully and impartially apply the law."

We conclude Battenfield has failed to rebut the presumption that the trial court was correct in finding that Elliott's views would have prevented or substantially impaired the performance of his duties as a juror. Further, we conclude the OCCA's resolution of this issue (i.e., its determination that Elliott's answers clearly indicated he could not consider imposing the death penalty

---

[3](...continued)
that the trial judge employed questions which may have been inconsistent with the legal standard announced in    Witt does not mean that Battenfield is automatically entitled to relief. Rather, the propriety of the questions utilized by the trial court is but one factor in determining whether Battenfield has sufficiently rebutted the presumption of correctness afforded under § 2254(e)(1).

regardless of the evidence and the instructions) was not contrary to or an unreasonable application of Witt.

*Prosecutorial misconduct*

Battenfield contends the prosecutor, during closing arguments in both the first and second stages of trial, improperly commented on Battenfield's constitutional right not to testify. During the first-stage closing arguments, the prosecutor stated to the jury: "There is no one, I repeat, there is no one who took the stand and testified that the victim, Don Cantrell, was ever anywhere near these keys [the keys to his truck which were found by a boat dock area after the murder]," Tr. at 1323, and "There wasn't a single witness that took the stand that indicated that there was any kind of injury to Mel Battiest or to this Defendant, Billy Ray Battenfield." Id. at 1403. During closing arguments in the penalty phase, the prosecutor made a similar statement: "Have you heard, Ladies and Gentleman, any evidence whatsoever during the course of this trial that indicates that this Defendant, Billy Ray Battenfield, after he struck that first blow, did anything to intervene to save Don Cantrell's life?" Id. at 1453. Battenfield objected to all of these comments during trial. The trial court overruled the objection to the first-stage comments, but sustained the objection to the second-stage comment.

17

As part of a general challenge to a variety of comments made by the prosecutor during trial, Battenfield raised this issue on direct appeal. The OCCA rejected the issue:

> Most of the comments complained of were not objected to and, in several instances where defense counsel's objections were sustained, the comment was stricken or the jury was admonished. Appellant attempts to characterize this case as one falling within the fundamental error rule where the combined effect of the prosecutor's actions "was so prejudicial as to adversely affect the fundamental fairness and impartiality of the proceedings and mandate a new trial." While some of the comments complained of were improper and not to be condoned, most of the comments when taken in context were within the bounds of reasonable argumentation, and we cannot agree they were so grossly improper as to require reversal or modification.

Battenfield I, 816 P.2d at 562 (internal citations omitted).

It is improper for a prosecutor to comment on a defendant's decision to refrain from testifying at trial. See Griffin v. California, 380 U.S. 609, 615 (1965). If a prosecutor's remarks "'concern matters that could have been explained only by the accused, . . . [they] give rise to an innuendo that the matters were not explained because [petitioner] did not testify' and, thus, amount to indirect comment on the defendant's failure to testify." Pickens v. Gibson, 206 F.3d 988, 999 (10th Cir. 2000) (quoting United States v. Barton, 731 F.2d 669, 674 (10th Cir. 1984)). "A prosecutor, however, 'is otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony." Id. (quoting Trice v. Ward, 196 F.3d 1151, 1167 (10th Cir.1999), cert. denied, 2000

18

WL 656673 (2000)). The question is "'whether the language used [by the prosecutor] was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent.'" Id. at 998 (quoting United States v. Toro-Pelaez, 107 F.3d 819, 826-27 (10th Cir. 1997)). "Error in permitting the prosecutor to comment upon petitioner's right to silence is subject to a harmless error analysis." Id. (citing Brecht v. Abrahamson, 507 U.S. 619, 628-29 (1993)).

The first-stage comments were proper. Although both were clearly intended as comments on Battenfield's failure to call certain witnesses or present certain testimony, neither concerned matters that could have been explained only by Battenfield. For example, Cantrell's whereabouts in the Wahoo Bay area on the night of the murder, including whether he was ever in close proximity to the boat dock where his keys were ultimately found, could arguably have been discussed by any of the persons who were present that evening. Likewise, those same witnesses, as well as other persons who observed Battenfield and Battiest after Cantrell's murder, could have testified regarding whether Battenfield or Battiest had any observable injuries.

The prosecutor's second-stage comment is more problematic. Like the two first-stage comments, this comment was aimed at Battenfield's failure to present evidence on a particular issue. However, the closing-stage comment differed

19

from the first-stage comments in that it concerned matters that could have been explained only by Battenfield or Battiest (who was called by the prosecution at trial and asserted his right to remain silent). Notwithstanding the impropriety of this comment, the OCCA did not unreasonably apply controlling Supreme Court precedent in determining that the effect of the comment was harmless. Battenfield's counsel posed a timely objection to the prosecutor's second-stage comment, and the trial court sustained the objection and admonished the jury to disregard the comment. In light of the general presumption that a jury follows a trial court's instructions, see Weeks v. Angelone, 120 S. Ct. 727, 733 (2000), we are persuaded that the trial court's admonition was sufficient to cure any error arising out of the prosecutor's comment.

*Ineffective assistance of counsel*

Battenfield contends his trial counsel, Dennis Shook, rendered ineffective assistance during the penalty phase of trial because he failed to adequately prepare or present any mitigating evidence. According to Battenfield, a variety of mitigating evidence was available, including (a) evidence that Battenfield's father and grandfather were involved in moonshining, (b) Battenfield's involvement in a serious car accident at age 18, during which he sustained a serious head injury and after which he heavily used alcohol and drugs, (c) Battenfield's family history

20

of alcoholism and possible drug addiction, (d) mental health evidence, including evidence that Battenfield suffered from substance addiction, (e) the underlying circumstances of Battenfield's previous conviction for assault and battery, which allegedly occurred while he was under the influence of drugs and alcohol and was an act of self-defense, (f) evidence from family members and friends indicating that Battenfield was known for his compassion, gentleness, and lack of violence, even when provoked, and (g) testimony of prison personnel describing the security where Battenfield would be incarcerated if given a life sentence. Although Battenfield acknowledges that he informed Shook and the trial court prior to the beginning of the penalty phase that he did not want to present any mitigating evidence, he argues that he did not knowingly and intelligently waive his right to present such evidence. Specifically, Battenfield argues that prior to the waiver, neither Shook nor the trial court adequately informed him of the nature or purpose of mitigating evidence.

Battenfield's claim of ineffective assistance is governed by the familiar two-part test announced in Strickland v. Washington, 466 U.S. 668, 688-89, 675 (1984). Under that test, Battenfield must demonstrate that (1) defense counsel's performance was constitutionally deficient (i.e., it fell below an objective standard of reasonableness), and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different.

21

> Because [the adversarial] testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (quoting Strickland, 466 U.S. at 691). Unquestionably, counsel's obligation to conduct reasonable investigations extends to matters related to the sentencing phase of trial. See Cooks v. Ward, 165 F.3d 1283, 1294 (10th Cir. 1998), cert. denied, 120 S. Ct. 94 (1999). "Indeed, we have recognized a need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case." Id. Where counsel's alleged failure to investigate and present evidence pertains to the sentencing phase of trial, the prejudice inquiry is whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; see also Cooks, 165 F.3d at 1296 (requiring court to consider strength of government's case and aggravating factors jury found to exist, as well as mitigating factors that might have been presented).

Battenfield first raised his claim regarding counsel's failure to adequately prepare and present mitigating evidence in his application for post-conviction relief. Although the state district court conducted an evidentiary hearing, it ultimately denied the application in its entirety, concluding in part that

22

Battenfield knowingly waived his right to present mitigating evidence during the penalty phase of trial.[4] The OCCA affirmed the denial of Battenfield's application for post-conviction relief. In rejecting Battenfield's ineffective assistance claim, the OCCA relied heavily on Battenfield's alleged waiver of his right to present mitigating evidence:

> Battenfield now argues that he did not have a thorough understanding of mitigation and did not realize it encompassed more than familial testimony. Although his waiver was not as good as it might have been, it appears to have been made knowingly and voluntarily. (Footnote omitted.) Even without the waiver, however, Battenfield has failed to show that trial counsel was ineffective by not presenting mitigating evidence. We have reviewed the Affidavits attached to Petitioner's Application and find they all contain evidence that Battenfield and his family could have presented to the jury had Battenfield cooperated with his attorney. Thus, the . . . allegations of ineffective assistance of trial counsel are a direct result of Battenfield's own refusal to testify and allow his parents to testify. We will not hold counsel responsible for a client's obstinate behavior.

Battenfield III, 953 P.2d at 1127. The OCCA also independently addressed Battenfield's assertion that his trial counsel should have gathered and presented mental health evidence during the penalty phase:

> This leaves only the . . . failure to present mental health evidence as a possible instance of ineffectiveness of counsel. However, Battenfield has failed to show that such expert testimony

---

[4] The state district court also concluded the ineffective assistance claim could have been raised by Battenfield on direct appeal and was thus procedurally barred. However, the OCCA did not affirm on this basis, and the State has not asserted procedural bar in this federal habeas proceeding.

23

was necessary. He did not then and does not now suffer from mental illness, mental infirmity, or incompetence to stand trial.

       Furthermore, Battenfield has failed to show prejudice. The psychologist's conclusion that Battenfield was chemically dependent does nothing to undermine our confidence in the jury's determination that he constitutes a continuing threat to society. Accordingly, Battenfield has failed to show that his counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

Id. (footnotes omitted).

The overriding question is whether the OCCA reasonably applied Strickland in rejecting Battenfield's ineffective assistance claim. See generally Brecheen v. Reynolds, 41 F.3d 1343, 1366 (10th Cir. 1994) (holding that, in pre-AEDPA case, state court conclusion that counsel rendered effective assistance is a mixed question of law and fact). Because the OCCA's decision was based on the state district court's finding that Battenfield knowingly waived his right to present mitigating evidence, we must examine the propriety of that finding. In performing our analysis, it is necessary to review several factors, including the investigative efforts of defense counsel prior to the beginning of the penalty phase, his penalty phase strategy, the advice he rendered to Battenfield prior to Battenfield's alleged decision to waive the presentation of mitigating evidence, and the trial court's examination of Battenfield regarding his alleged waiver.

Shook received his Oklahoma law license in October 1980. He worked as an assistant district attorney in Wagoner County, Oklahoma, from October 1980

24

until December 31, 1982, and tried 10-15 felony cases. On January 1, 1983, he entered private practice in Wagoner County. The trial court appointed Shook to represent Battenfield and Shook received a total of $2,500.

The evidence presented at the state court evidentiary hearing indicates Shook spent very little time investigating possible mitigating evidence or developing mitigation strategies. Although Shook allegedly spent over 100 hours preparing for the trial, only 20 of those hours were spent interviewing potential witnesses. Of those 20 hours, it is unclear how many were devoted to penalty phase preparation. According to Shook, he "spent very little time developing mitigation," and the only mitigation strategy he considered was to invoke the jury's sympathy and mercy. Shook Aff. His alleged plan was to present the testimony of Battenfield's parents "to kind of describe Billy's background; I wanted to bring out the positive things, the positive aspects of Billy's life; and most importantly, I wanted the parents to be able to ask the jury not to impose the death penalty." Evidentiary Hearing Tr., Vol. II at 118-19. However, the evidence indicates that although Shook may have briefly spoken to Battenfield's parents prior to and during trial, he never interviewed them regarding Battenfield's background and, indeed, was unaware of many, if not most, of the mitigating factors now cited by Battenfield. Further, although Shook testified that he spoke with Battenfield on several occasions regarding the possibility of a

25

penalty phase, there is no indication that he ever interviewed Battenfield regarding his background.  See Battenfield Aff. ¶ 3 ("Dennis Shook . . . never talked to me about my childhood or past.").  Finally, there is no evidence that Shook spoke to any of Battenfield's friends or relatives (other than his parents), to any mental health experts[5], or to any other potential mitigation witnesses (e.g., persons familiar with Battenfield's personality and temperament, persons familiar with the underlying facts of Battenfield's previous conviction[6], persons familiar with incarceration and security in Oklahoma state prisons).

Based upon this evidence, we conclude that Shook's penalty phase preparation was constitutionally deficient.[7]  The Supreme Court has emphasized

---

[5] Shook testified that, at some point during trial, he informally spoke to the trial judge about the possibility of receiving funding to hire a mental health expert to use during the mitigation phase.  The judge indicated there was no funding available and Shook did not file a formal motion because, in part, he found no authority for the appointment of a court-paid expert.

[6] Shook knew the state intended to rely on evidence of Battenfield's previous conviction for assault and battery with a dangerous weapon and should have performed some type of investigation to determine the underlying facts of that conviction.  Based upon the evidence presented by Battenfield in connection with his post-conviction application, it appears there were mitigating aspects to that prior crime that could have been presented to the jury (i.e., the fact Battenfield may have acted in self-defense, and the fact he was under the influence of drugs and alcohol at the time of the incident).

[7] In disposing of Battenfield's ineffective assistance claim, the OCCA made no mention of Shook's investigative efforts.  Thus, we are free to exercise our independent judgment in determining whether Shook's investigative efforts were constitutionally deficient.  Even assuming, arguendo, the OCCA intended to

(continued...)

that the reliability of a capital sentencing proceeding hinges upon the jury making an individualized determination based, in part, upon "the particularized characteristics of the individual defendant." Gregg v. Georgia, 428 U.S. 153, 206 (1976). A defense attorney "has a *duty* to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.'" Brecheen, 41 F.3d at 1366 (quoting Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988)); see also Stouffer v. Reynolds, 168 F.3d 1155, 1167 (10th Cir. 1999) (noting that defense counsel has a duty to investigate all possible lines of defense). Here, Shook violated that duty by failing to interview anyone, including Battenfield himself, regarding possible mitigating aspects of Battenfield's background. See, e.g., Clayton v. Gibson, 199 F.3d 1162, 1178 (10th Cir. 1999) (assuming, without deciding, that defense counsel "rendered deficient assistance by not contacting family members during the course of conducting a second stage investigation"), cert. denied, 2000 WL 697188 (2000); Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir. 1995) (concluding that reasonable investigation would have included interviews with defendant's sister and neighbor, as well as defendant's mother and brother); Stafford v. Saffle, 34 F.3d 1557, 1563 (10th Cir. 1994) (concluding that counsel's penalty-phase

---

[7](...continued)
indicate that Shook's investigative efforts were sufficient, we would conclude the OCCA unreasonably applied    Strickland .

27

performance was deficient where counsel explored defendant's "background to some degree," but "conducted no specific investigation for mitigation evidence"); Blanco v. Singletary, 943 F.2d 1477, 1501-02 (11th Cir. 1991) (concluding defense counsel was ineffective for failing to contact defendant's relatives and acquaintances prior to trial); Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989) (concluding defense counsel's performance was deficient where "neither lawyer . . . investigated [the defendant's] background, leading to their total–and admitted–ignorance about the type of mitigation evidence available to them"); Stephen B. Bright, Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting, 36 Santa Clara L. Rev. 1069, 1085-86 (1996) ("The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community."). The result was that Shook was unaware at the time of trial of various mitigation strategies and accompanying pieces of evidence that could have been presented during the mitigation phase by Battenfield or his friends and family. Further, Shook was wholly unprepared to rebut the aggravating factors argued by the prosecution.

We have no doubt that Shook's failure to conduct an adequate investigation

28

hampered his ability to make strategic decisions regarding the penalty phase of trial. In Strickland, the Supreme Court emphasized that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91; see also Duvall v. Reynolds, 131 F.3d 907, 917 (10th Cir. 1997) ("The duty to present mitigating evidence, of course, is not independent of the duty to investigate and prepare."), cert. denied, 525 U.S. 933 (1998); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."). Shook's failure to investigate Battenfield's background, and his failure to explore other readily apparent mitigation possibilities, rendered unreasonable his alleged penalty-phase strategy of focusing on sympathy and mercy. In other words, contrary to the dissent's suggestion, there was no strategic decision at all because Shook was ignorant of various other mitigation strategies he could have employed.

In addition to hampering his ability to make strategic decisions, Shook's failure to investigate clearly affected his ability to competently advise Battenfield regarding the meaning of mitigation evidence and the availability of possible mitigation strategies. Shook testified that, prior to trial, he had "numerous

29

conversations [with Battenfield] about the possibility of having a second stage." Evidentiary Hearing Tr., Vol. II at 115. Whatever those conversations may have entailed, there is no indication Shook ever explained the general meaning of mitigation evidence to Battenfield or what specific mitigation evidence was available. Shook acknowledged he never advised Battenfield that mitigation evidence might include evidence about Battenfield's substance abuse problems. At best, the evidence indicates that at some point during the trial proceedings, Shook discussed with Battenfield his plan to present Battenfield's parents as second-stage witnesses and his strategy to have Battenfield's parents beg for Battenfield's life. In an affidavit submitted in connection with his application for post-conviction relief, Battenfield indicated that Shook never explained to him "the importance of mitigation or . . . what mitigation actually [wa]s." Battenfield Aff. ¶ 2.

Shook's deficient performance culminated in Battenfield waiving the right to present mitigating evidence. The jury returned its first-stage verdict at approximately 11:20 a.m. on the last day of trial. After receiving this verdict, the trial court took an hour and twenty-minute lunchtime recess. According to Shook, Battenfield "was quite upset and, in my opinion, pretty irrational at that point in time." Evidentiary Hearing Tr., Vol. II at 116. Shook testified that during the recess, Battenfield "instructed [him] that he did not want to put on evidence in

30

mitigation for the second stage." Id. Although Shook allegedly advised Battenfield that they "should proceed with the mitigating evidence," Battenfield again indicated that he did not want to proceed with the mitigation evidence proposed by Shook. Id. at 117. According to Battenfield, he "did not know what mitigation was [at that point], [he] just did not want [his] mom and dad to testify." Battenfield Aff. ¶ 5. More specifically, Battenfield stated:

> After I was convicted of first degree murder and before second stage deliberations began, my attorney asked me as to whether or not I wanted to have my parents testify. Dennis Shook never talked to me about any other people [testifying]. I did not want my parents to testify because I did not want to cause them anymore grief and sadness. I personally witnessed my father crying and sobbing for the first time in my life after I was convicted. My dad was always rock solid and seeing him cry was so out of character for him that it made me feel that I had to spare him and my mom from any more stress.

Id. ¶ 4.

At the conclusion of the court recess for lunch, Shook asked the trial court to make a record outside the hearing of the jury. The following discussion took place between Shook, Battenfield, and the trial judge:

> THE COURT: Let the record show the Defendant is present with his attorney, Mr. Shook. The State is represented by Assistant District Attorney Mr. Langley and Mr. Sperling. I have been advised by Mr. Shook that the defendant wants to make a record.
> MR. SHOOK: That is correct, Judge. I have just spoken with Mr. Battenfield, along with Joe Robertson who is the attorney for the co-defendant, Melvin Battiest. The defendant, Billy Ray Battenfield, has informed me that he does not wish to take the stand and testify in this matter. It's my advice that he do so. Billy, I would like for you to comment on that.

31

THE DEFENDANT: I'm going against my attorney's advice and not taking the stand.

THE COURT: All right. Are you being abused, mistreated or forced to make you go against his advice?

THE DEFENDANT: No, sir.

THE COURT: It was my understanding that from visiting with Mr. Shook that you don't even want to put on any evidence as to mitigation; is that correct?

THE DEFENDANT: You mean my parents and stuff?

THE COURT: Yes.

THE DEFENDANT: No, sir, they have been through enough.

THE COURT: You're not going to present any testimony as to mitigation?

THE DEFENDANT: No, sir.

THE COURT: You understand you have that right?

THE DEFENDANT: Yes, sir.

THE COURT: All right, then we will proceed.

Trial Tr. at 1421-22

Although the state district court found, and the OCCA agreed, that the waiver was knowing and intelligent, we conclude the above-outlined evidence is more than sufficient to overcome any presumption of correctness afforded to this finding.[8] When the above-quoted colloquy took place, Battenfield did not have a

---

[8] Although there are numerous published cases (both federal and state) where a capital defendant has waived the right to present mitigating evidence, very few have actually addressed whether the propriety of the waiver is purely a factual issue or a mixed question of fact and law. Of the few cases that have addressed this issue, the holdings appear conflicting. Compare Singleton v. Lockhart, 962 F.2d 1315, 1321 (8th Cir. 1992) (treating as a factual finding the question of whether the defendant knowingly and intelligently waived his right to present mitigating evidence), and State v. Ashworth, 706 N.E. 2d 1231, 1237 (Ohio 1999) (indicating a trial court in a capital case must "make findings of fact as to the defendant's understanding and waiver of" his right to present mitigating

(continued...)

32

proper understanding of the general nature of mitigating evidence or the specific

types of mitigating evidence that might be available for presentation. He only

knew that Shook intended to put his parents on the witness stand and have them

beg for the jury's mercy and sympathy. Battenfield's narrow conception of what

mitigation meant is evidenced by his response to the trial judge's questioning

("You mean my parents and stuff?"). Finally, the trial judge's questioning of

Battenfield regarding his decision to waive was brief and, in our view,

inadequate. The trial court failed to adequately determine that Battenfield had

---

[8](...continued)
evidence), with Wilkins v. Bowersox, 145 F.3d 1006, 1015-16 (8th Cir. 1998) (suggesting that whether a defendant knowingly and intelligently waived his right to present mitigating evidence is a mixed question of fact and law), cert. denied, 525 U.S. 1094 (1999), and Snell v. Lockhart, 14 F.3d 1289, 1302-03 (8th Cir. 1994) (same). Likewise, the courts have differed in their characterizations of other types of waivers. See, e.g., Tacon v. Arizona, 410 U.S. 351, 352 (1973) (concluding that whether petitioner's conduct amounted to a knowing and intelligent waiver of the right to be present at trial was "primarily a factual issue"); United States v. Burson, 952 F.2d 1196, 1199 (10th Cir. 1991) (concluding that question of whether waiver of right to counsel was knowing and voluntary is a mixed question of fact and law); Meeks v. Cabana, 845 F.2d 1319, 1323 (5th Cir. 1988) (holding that "[t]he state court's finding of waiver [of the right to appeal] involves a pure question of fact"). We find it unnecessary to definitively characterize the waiver as either a factual issue or a mixed question of fact and law because the outcome of the appeal would be the same regardless. In other words, if it is characterized as a mixed question of fact and law, we would conclude that the OCCA unreasonably determined Battenfield's waiver was knowing and intelligent. If the issue is characterized as a question of fact, we would conclude the state district court's finding on this issue was unreasonable in light of the evidence presented during the evidentiary hearing on Battenfield's application for post-conviction relief.

33

been provided sufficient information from Shook to make a knowing choice.

In determining that Battenfield's alleged waiver was knowing when that issue was raised in Battenfield's application for post-conviction relief, the state district court relied heavily on the evidentiary hearing testimony of the judge who presided over Battenfield's trial. A review of that testimony, however, suggests it is of questionable value in determining whether Battenfield's waiver was knowing and voluntary. Under cross-examination by Battenfield's counsel, the trial judge acknowledged that mitigating evidence could include more than calling a capital defendant's parents to the witness stand. In particular, the trial judge acknowledged that mitigating evidence could include information about a defendant's family history, psychological information, evidence of alcoholism, or a family history of alcoholism. The following series of questions and answers then took place between Battenfield's attorney and the trial judge:

> Q. Would you agree with me, Judge, that when you responded "Yes" to Mr. Battenfield saying, "You mean my parents and stuff?" that he might not have . . . a full and fair understanding on his part about what mitigation was?
> A. Well, I don't agree with you.
> Q. Okay. Explain to me why that might be.
> A. Well, I mean, you're talking about when he says family and stuff?
> Q. Uh-huh.
> A. Well, what you've gone back over, alcoholism and all these other things that you've named off, social problems and all this, that would cover it under family and stuff. But it was my understanding they [Battenfield and Shook] had discussed it, talked about it, and that was – but he did not want to put on any evidence.

34

Q. Judge, do you recall – well, if I were to tell you that Mr. Shook had spent, according to evidence that we have in the record, had spent virtually no time discussing the concept of mitigation with Mr. Battenfield or with his parents, would you have any reason to believe that Mr. Shook could have given adequate advice to Mr. Battenfield about what that evidence might have been?

A. Sir, I don't really understand your question.

* * *

Q. If the evidence in the record is that Mr. Shook had really spent no time discussing with Mr. Battenfield what mitigation was, and had spent no time preparing for a mitigation case, then do you know of any reason why Mr. Shook's advice to Mr. Battenfield about what mitigation was would be adequate?

A. Well, I don't know why the – the record, you say, is silent as to that?

Q. No. Actually, the record affirmatively, I think, demonstrates that Mr. Shook didn't undertake a mitigation investigation. So my concern is, as a trial judge–

A. Well, wait just a minute. You're saying that he did not discuss this mitigation procedure with him at all?

Q. I'm saying we have evidence in the record that would indicate that that's the case. And that he did not investigate the mitigation phase of the case. He had done no investigation of the social history of Mr. Battenfield, he had done no real family investigation. My only question to you is: As a trial judge, if you had been aware of that would you have been less comfortable about concluding that Mr. Battenfield was adequately informed as to what mitigation was?

A. I don't – I think you're asking me a question that does not properly reflect what transpired in this case. I think Mr. Shook and him did discuss it. I was satisfied at the time that they had discussed it, from visiting with Mr. Shook. That's the reason they asked to make a record and come to the bench – or to do that and make that record. You're asking me to suppose that certain things did or did not happen. And sir, I'm satisfied that it did happen the way the record reflects from the standpoint of him knowing about mitigation. The bill of particulars was filed. They had them and I assumed had gone over them. He indicated that they had, that they knew what he – he knew what he was doing in the courtroom that day.

35

Evidentiary Hearing Tr., Vol. I at 114-16. Obviously, the trial judge's assumptions about what transpired between Shook and Battenfield prior to the waiver are not borne out by the record. In particular, the record is clear that Shook did not adequately apprise Battenfield of the meaning of mitigation evidence or what particular mitigating evidence was available in his case. Further, it is apparent the trial judge failed, at the time he questioned Battenfield on the record, to ensure that Battenfield had sufficient information to knowingly waive his right to present mitigation evidence.[9]

Less than a month after Battenfield's trial, the OCCA established guidelines for trial courts to follow "when a defendant refuses to allow the presentation of mitigating evidence in the sentencing stage." Wallace v. State, 893 P.2d 504, 512 (Okla. Crim. App. 1995). Those guidelines, intended to ensure that a defendant "has an understanding of his or her rights . . . in the sentencing process," require a trial court to: (1) inform the defendant of the right to present mitigating evidence, and what mitigating evidence is; (2) inquire both of the defendant and his attorney (if not pro se) whether he or she understands these

---

[9] The dissent suggests the state courts could have decided that the testimony of Shook and the trial judge was more credible than that of Battenfield. We disagree. Shook never directly controverted Battenfield's statements. As for the trial judge, a careful examination of his testimony reveals that he had little, if any, factual basis for determining whether Shook adequately advised Battenfield regarding mitigation evidence and strategy.

rights; (3) inquire of the attorney if he or she has attempted to determine from the defendant whether any mitigating evidence exists; (4) inquire what that mitigating evidence is (if the defendant has refused to cooperate, the attorney must relate that to the court); (5) inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence; (6) after being assured the defendant understands these concepts, inquire of the defendant whether he or she desires to waive the right to present such mitigating evidence; and (7) make findings of fact regarding the defendant's understanding and waiver of rights. Id. at 512-13. The trial judge in Battenfield's case failed to satisfy any of these requirements.

Although the State correctly argues that Wallace "was not the law at the time of Appellant's 1985 trial," State's Appellate Br. at 30 n.3, the guidelines set forth in Wallace are, in our view, little more than commonsense and should have been substantially followed by the trial court. We emphasize that our conclusion regarding the inadequacy of the trial court's inquiry does not hinge in any way upon the holding in Wallace. Instead, we simply find it useful, for analytical purposes, to contrast the trial court's inquiry in this case with the guidelines set

37

forth by the OCCA in Wallace.

Given our conclusion that Battenfield's waiver was neither knowing nor intelligent, the next question is whether Shook was ineffective for failing to present any mitigating evidence. Although the OCCA determined that Battenfield's waiver was knowing and intelligent (a determination we have already rejected under the AEDPA standards of review), it alternatively determined that "[e]ven without the waiver, . . . Battenfield ha[d] failed to show that [Shook] was ineffective by not presenting mitigating evidence." Battenfield III, 953 P.2d at 1127. According to the OCCA, most of the mitigating evidence to which Battenfield pointed in his application for post-conviction relief could have been presented by "Battenfield and his family . . . had Battenfield cooperated with his attorney." Id. In other words, the OCCA determined, Shook's failure to present mitigating evidence was "a direct result of Battenfield's own refusal to testify and allow his parents to testify." Id.

In our view, this is a patently unreasonable application of Strickland. We see no difference between Battenfield's purported waiver and his so-called "lack of cooperation." If the waiver is found to be neither knowing nor intelligent, the so-called lack of cooperation must fall by the wayside. Even ignoring this flaw in the OCCA's reasoning, we fail to see how Battenfield can be held responsible for

38

Shook's failure to present mitigating evidence unknown to Shook.[10] Had Shook conducted a constitutionally adequate investigation of potential mitigating evidence, he would have had a variety of witnesses from whom to choose.

We conclude that Battenfield was deprived of effective assistance of counsel during the penalty phase of trial. Shook failed to conduct a constitutionally adequate pretrial investigation into potential mitigation evidence which, in turn, hampered his ability to make strategic choices regarding the second-stage proceedings and competently advise his client regarding those proceedings. Because Battenfield did not receive competent advice from Shook regarding the second-stage proceedings, and because the trial court failed to conduct an adequate inquiry into his decision to waive mitigation evidence, we conclude Battenfield's purported waiver was neither knowing nor voluntary. Finally, we conclude Shook was ineffective for failing to present any mitigation evidence during the second-stage proceedings.

The remaining question is whether Battenfield was prejudiced by Shook's

---

[10] The dissent suggests that, "[h]ad Mr. Battenfield cooperated with Mr. Shook's second-stage strategy, evidence that he 'was known for his compassion, gentleness, and lack of violence even when provoked,' . . . surely would have been brought out, even without an extensive investigation." We strongly disagree. Because Shook never conducted any investigation into the potentially mitigating aspects of Battenfield's life or personality (e.g., his apparent lack of propensity for violence), we fail to understand how Shook would have known to elicit such evidence from Battenfield or his parents during the second-stage proceedings.

inadequate performance. Because the OCCA never addressed this issue[11], we are free to exercise our independent judgment. Battenfield must "affirmatively prove actual prejudice by demonstrating 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Cooks, 165 F.3d at 1296 (quoting Strickland, 466 U.S. at 693-94). "As applied to the sentencing stage of his trial, [Battenfield] must demonstrate 'a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Id. (quoting Strickland, 466 U.S. at 695).

"In evaluating prejudice, we must keep in mind the strength of the government's case and the aggravating [circumstances] the jury found as well as the mitigating factors that might have been presented." Castro v. Ward, 138 F.3d 810, 832 (10th Cir.) (internal quotations omitted), cert. denied, 525 U.S. 971 (1998). Here, the jury found two aggravating circumstances to support Battenfield's death sentence: (1) the heinous, atrocious, or cruel nature of Cantrell's murder; and (2) the continuing threat Battenfield presented to society.

---

[11]  The OCCA did discuss whether Battenfield was prejudiced by Shook's failure to present expert mental health testimony indicating that Battenfield was chemically dependent.    Battenfield III , 953 P.2d at 1127.  However, we find that analysis irrelevant because we are not persuaded Shook was ineffective for failing to obtain and present expert mental health testimony.  Our prejudice inquiry focuses instead on Shook's failure to obtain and present the various other types of mitigating evidence pointed to by Battenfield.

However, the OCCA on direct appeal struck the heinous, atrocious, or cruel factor on the grounds that it was not supported by the evidence. See Battenfield I, 816 P.2d at 565 (noting that the blow to Cantrell's head would likely have rendered him immediately unconscious). Thus, only the continuing threat circumstance remains to support Battenfield's death sentence. The state argued that Battenfield had twice been convicted of violent felonies: once for the 1978 assault and battery with a dangerous weapon conviction, and again in 1985 for the murder of Cantrell.[12] When the OCCA reweighed the aggravating and mitigating circumstances on direct appeal, it concluded the continuing threat factor was supported by the "calloused nature" of Cantrell's murder and by the fact that Battenfield had previously been convicted of a violent felony. Battenfield I, 816 P.2d at 566.

Battenfield had available a variety of mitigating evidence to counterbalance this single aggravating factor. Although the underlying facts of his 1978 conviction are somewhat sketchy, the record suggests it may have been an act of self defense on the part of Battenfield. In particular, the evidence indicates Battenfield "was playing pool in a bar when a 'drunk Indian' fell or knocked into the pool table. Words were exchanged, the Indian pulled a gun, and [Battenfield]

---

[12] During the penalty phase, the state incorporated by reference the evidence presented during the guilt phase. Aside from that, the only additional evidence presented by the state was a copy of the 1978 judgment of conviction.

defended himself with a knife." St. Peter Aff. ¶ 17. Both the 1978 crime and the murder of Cantrell were committed when Battenfield was under the influence of drugs or alcohol. Arguably, this evidence could be viewed in a mitigating light, particularly if combined with evidence that Battenfield would have little or no access to drugs or alcohol while in prison, or evidence that Battenfield was amenable to treatment for his substance abuse problems (or even perhaps evidence indicating that Battenfield's reliance on drugs and alcohol dramatically worsened after his 1970 car accident). Battenfield's family members and friends would have testified that Battenfield "was known for his compassion, gentleness, and lack of violence even when provoked." Id. Further, persons familiar with the Oklahoma correctional system could have testified about Battenfield's chances of parole and the limitations that would be placed on his access to alcohol and drugs.

Without discounting the calloused nature of Cantrell's murder, we conclude there is a reasonable probability that this mitigating evidence would have led the jury to reach a different sentencing result. We emphasize that, because of Shook's failure to present any mitigating evidence during the penalty phase, the jury sentenced Battenfield knowing only that he was involved in the murder of Cantrell and previously had been convicted of assault and battery with a dangerous weapon. Had they been given more information about Battenfield's background, personality, and the facts of his prior conviction, we conclude there

42

is a reasonable probability they would have determined the mitigating circumstances outweighed the single aggravating circumstance. See generally Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir. 2000) (noting the "overwhelming importance" of mitigation evidence in humanizing a criminal defendant and explaining his conduct). Alternatively, we conclude there is a reasonable probability they would have determined Battenfield did not represent a continuing threat to society.[13] For these reasons, we conclude that Shook's deficient conduct "so undermined the proper functioning of the adversarial process that the [penalty phase of] the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

IV.

We REVERSE the judgment of the district court and REMAND with instructions that the district court grant the writ as to Battenfield's death sentence, subject to the state district court conducting a new sentencing trial or vacating Battenfield's death sentence and imposing a lesser sentence consistent with law.

---

[13] The dissent asserts that we are speculating regarding the likely effect the available mitigating evidence would have had on the jury's second-stage verdict. Under the circumstances of this case, where we are faced with a determination of whether Battenfield was prejudiced by his counsel's inadequate second-stage performance, we have little choice. Indeed, the dissent must also speculate by suggesting that Battenfield would not have allowed witnesses other than his parents to testify and in assuming the available mitigating evidence would not have altered the second-stage outcome.

See <u>Richmond v. Lewis</u>, 506 U.S. 40, 52 (1992) (utilizing conditional issuance of writ of habeas corpus to require constitutional compliance by state courts); <u>Pickens</u>, 206 F.3d at 1003 (10th Cir. 2000) (same); <u>see</u> <u>also</u> <u>Smith v. Lucas</u>, 9 F.3d 359, 367 (5th Cir. 1993) (noting that the "real thrust" of a federal court's conditional issuance of a writ of habeas corpus "is to alert the state court to the constitutional problem and notify it that the infirmity must be remedied").  In light of this determination, we find it unnecessary to address Battenfield's remaining contention that the evidence presented during the sentencing phase was insufficient to support the jury's finding that he represented a continuing threat to society.

No. 99-7096, Billy Ray Battenfield vs. Gary L. Gibson.

**KELLY** , Circuit Judge, concurring in part and dissenting in part.

While I concur in the court's opinion to the extent it affirms the district court's denial of habeas relief, I dissent from reversal and remand of Mr. Battenfield's ineffective assistance of counsel claim. In my view, the court's resolution of this claim does not comport with either the proper standard of review or the principles governing ineffectiveness claims.

On collateral review, we may only grant relief if the state court's adjudication of a federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). State court factual findings are presumed correct, and one seeking federal habeas relief "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1).

Ineffective assistance of counsel requires a petitioner to demonstrate deficient performance and prejudice. Strickland v. Washington , 466 U.S. 668, 687 (1984). As mixed questions of law and fact, we do not afford a presumption of correctness to State court determinations on these issues. Herrera v. Lemaster , 225 F.3d 1176, 1178-79 (10th Cir. 2000). However, we do accord a presumption

of correctness to state court findings of historical fact underlying these issues. Brecheen v. Reynolds, 41 F.3d 1343, 1366 (10th Cir. 1994). Moreover, merely because we may have come to a different resolution on the same facts does not warrant habeas relief. An unreasonable application of federal law means something beyond what we may perceive in our independent judgment as an erroneous or incorrect application of clearly established federal law. Williams v. Taylor, 120 S. Ct. 1495, 1522 (2000).

In deciding that the Oklahoma Court of Criminal Appeals ("OCCA") unreasonably applied Strickland, the court determines that Mr. Battenfield has proven that his trial counsel, Mr. Shook, rendered deficient performance because he failed to adequately investigate potential mitigation evidence in the second stage of the trial. According to the court, this "hampered" Mr. Shook's ability to make strategic choices about the penalty phase and to competently advise his client. This incompetent advice, coupled with the trial court's inadequate inquiry into Mr. Battenfield's decision to forego mitigating evidence, resulted in a waiver that was neither knowing nor voluntary.

The claim in this case is merely a vehicle to correct an error in judgment by Mr. Battenfield, specifically his decision to waive his right to present mitigating evidence. The proper, and properly limited, function of a federal habeas court in this context is to insure that the death penalty is not imposed in violation of the

2

Constitution.  Herrera v. Collins , 506 U.S. 390, 400-01 (1993).  If Mr. Battenfield made a knowing and intelligent waiver of his right to present mitigation evidence, then his counsel cannot have been ineffective for failing to develop such evidence.  See Wallace v. Ward , 191 F.3d 1235, 1247-48 (10th Cir. 1999).

The failure to present mitigating evidence is not per se ineffective assistance of counsel.  Brecheen , 41 F.3d at 1368.  The reason why no mitigating evidence was presented matters greatly.  Id.  Here, the OCCA affirmed the state post-conviction trial court's express determinations, made after an evidentiary hearing, that Mr. Battenfield knowingly and intelligently waived that right. Battenfield v. State , 953 P.2d 1123, 1127 (Okla. Crim. App. 1998),  aff'g Battenfield v. State , No. CF-84-73, Findings of Fact and Conclusions of Law and Order Denying Post-Conviction Relief at 6 (Wagoner County Dist. Ct. May 13, 1997) ("It was the opinion of the trial Court that the petitioner knowingly waived his right to present mitigating evidence and this Court agrees.").  Though this court reweighs the evidence and comes to a different conclusion, the record evidence fully supports the state courts' determination on this point.

Mr. Shook testified that he had "numerous conversations [with Mr. Battenfield] about the possibility of having a second stage," and that most of those conversations took place prior to trial.  Hr'g Tr. at 2:115-16.  He also

3

testified that, having previously discussed second-stage proceedings with Mr. Battenfield, Mr. Battenfield's decision at trial happened completely without warning. Id. at 134. It is uncontroverted that Mr. Shook advised Mr. Battenfield to present mitigating evidence and that Mr. Battenfield declined Mr. Shook's advice. Trial Tr. at 1421; Hr'g Tr. at 2:117-18. Mr. Battenfield not only declined to testify on his own behalf, but also to put on any other mitigating evidence ("my parents and stuff"). Trial Tr. at 1421-22; Hr'g Tr. at 2:117-18. This was not for want of adequate investigation or lack of a second-stage strategy by Mr. Shook, or improper safeguards by the state district court on waiver. Rather, it was due to Mr. Battenfield's conscious choice.

By affidavit and testimony, Mr. Shook indicated that Mr. Battenfield was angry about the outcome of the first stage.

> Mr. Battenfield waived his right to testify and did not want me to put his parents on the stand. If I had been permitted to present his parents, I would have had them testify as to his good character[]. His decision to waive mitigation occurred immediately after the jury found him guilty. He was angry, upset, depressed, and stated that the jury could do whatever they wanted. Basically, he just gave up.

Shook Aff. at 1-2. Although Mr. Shook felt that Mr. Battenfield "was not in a condition to knowingly waive this vital stage of the trial," Mr. Shook followed the wishes of his client:

> When Mr. Battenfield told me he did not want to put any mitigation on in the second stage, I was not expecting it. I had never encountered a situation such as this, and was not sure of what action

4

to take. I followed Mr. Battenfield's wishes even though I knew it was the wrong action to take. If I knew that I could have continued with the second stage as I had planned despite Mr. Battenfield's attitude, I would have done so.

Id. at 2; accord Hr'g Tr. at 2:116-17.

The state courts could certainly reject Mr. Battenfield's post-conviction assertion that Mr. Shook never explained "the importance of mitigation or . . . what mitigation actually is." Battenfield Aff. ¶ 2. They could instead decide that the testimony of Mr. Shook and the original trial judge to the contrary was more credible. E.g., Hr'g Tr. at 1:116, 119-20; see also id. at 2:120 (direct examination of Mr. Shook) (Q: "Had you explained to the defendant the meaning of mitigating evidence and what you intended to present? A: Yes."). Despite a vigorous cross-examination at the state post-conviction hearing, the trial judge was steadfast in his belief (then and at the hearing) that Mr. Shook had discussed mitigation with his client. Id. at 1:116. He based this belief upon his visits with Mr. Shook, the request by the defense to make a record on the issue, and the furnishing of the bill of particulars to the defense. Id. The fact that the OCCA would later issue guidelines governing the waiver of the right to put on mitigating evidence should not cause us to disregard the careful inquiry at the state post-conviction evidentiary hearing. Cf. Wallace v. State, 893 P.2d 504, 512 (Okla. Crim. App. 1995).

Plainly, the reasonableness of Mr. Shook's actions must be judged against

5

the firm desires of his client.    See Strickland , 466 U.S. at 691.  We have held that a defendant may waive the right to put on mitigating evidence.        Wallace , 191 F.3d at 1247-48.  There is little reason to believe that Mr. Battenfield would have allowed the presentation of mitigating evidence at his trial, even if that evidence came from sources other than himself or his parents.  Mr. Battenfield's expert testified that while defense counsel cannot compel a defendant to testify in the second stage, counsel that does not present mitigating evidence, even over the objection of his client, renders deficient performance.  Hr'g Tr. at 1:22, 36.  This is directly at odds with the client's right to participate in his own defense, let alone Strickland .  See Smith v. Massey , No. 99-7143, 2000 WL 1854145, at *6 (10th Cir. Dec. 19, 2000) ("Although the legal expert who testified on behalf of Smith in her post-conviction proceedings testified that [Smith's trial attorney] should have pursued the 'architect' or 'manipulation' theory notwithstanding Smith's wishes, this testimony is clearly inconsistent with the Supreme Court's view of the attorney-client relationship.").

The premise of the court's decision, that Mr. Shook lacked an adequate mitigation strategy due to an inadequate investigation also is not supported.  Mr. Shook testified that he visited with Mr. Battenfield's parents at court appearances and in his office, though he could not recall how many times, and that he conversed with them about the purpose of their potential second-stage testimony.

6

Hr'g Tr. at 2:138. He was aware of Mr. Battenfield's troubled life, including his problems with substance abuse and his association with the "wrong crowd." Id. at 2:131, 135. He further testified that he intended to call Mr. Battenfield's parents and perhaps a sibling, as witnesses and that he had conversed with his client regarding the presentation of such evidence. Id. at 2:115. He intended to describe Mr. Battenfield's background, to bring out the positive aspects of his life, and to have his parents ask the jury not to impose the death penalty. Id. at 2:118-19, 138-39. This was a permissible trial strategy to which a reviewing court owes deference, notwithstanding that there may have been other ways to defend the case. See Strickland, 466 U.S. at 689-90; Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir. 2000) (mitigation evidence serves to humanize and explain the defendant).

The mitigating evidence that the court views as significant is contained primarily in a social worker's assessment of Mr. Battenfield. It includes a double hearsay account of the circumstances of Mr. Battenfield's 1978 conviction, perhaps related by Mr. Battenfield himself. St. Peter Aff. ¶ 17 ("[Mr. Battenfield] states that all of this occurred while in a blackout so he only has others' descriptions to rely on as to what actually occurred."). The evidence of alcohol dependence came from a four-hour evaluation of Mr. Battenfield by a clinical psychologist. Hr'g Tr. at 2:48; Murphy Aff. at 2 ("His personality testing

7

found that Mr. Battenfield suffers exclusively from alcohol dependence."). This court concludes that the "continuing threat" aggravator could have been mitigated with evidence that Mr. Battenfield would not have had access to alcohol in prison, that he may have been amenable to treatment, or that his alcoholism may have worsened as a result of a car accident occurring some eight years prior to the assault and battery conviction. Ct. Op. at 41-42;     see also Boyd v. Ward , 179 F.3d 904, 918 (10th Cir. 1999) (available mitigating evidence must be viewed against the strength of the State's case and the aggravators actually found), cert. denied , 509 U.S. 108 (2000). All of this is nothing more than speculation; the evidence about alcoholism just as easily could have had an unintended and negative effect upon the jury.

Regardless, the OCCA was unassailably correct in concluding that the substance of the mitigating evidence (which is largely historical data) could have been presented by Mr. Battenfield and his family, particularly his parents, had he heeded the advice of counsel.     Battenfield , 953 P.2d at 1127. Had Mr. Battenfield cooperated with Mr. Shook's second-stage strategy, evidence that he "was known for his compassion, gentleness, and lack of violence even when provoked," St. Peter Aff. ¶ 17, surely would have been brought out, even without an extensive investigation.

In sum, the court's decision is at odds with our current standard of review

8

and with Strickland. Mr. Battenfield rejected the assistance his counsel offered. Moreover, the actions that counsel took prior to the waiver were reasonable under the circumstances. I respectfully dissent from this portion of the court's opinion and would affirm the district court's denial of the writ. [1]

---

[1] Mr. Battenfield also argues that the evidence is insufficient to sustain the death penalty because the OCCA, in upholding the continuing threat aggravator, relied upon the 1978 conviction (for assault and battery with a dangerous weapon after former conviction of a felony), which the jury apparently rejected as a basis for a continuing threat aggravator. See Battenfield v. State, 816 P.2d 555, 566, reh'g denied, 826 P.2d 612, 613-14 (Okla. Crim. App. 1991). The jury's rejection of the continuing threat aggravator described in the State's bill of particulars, however, cannot be viewed as a factual rejection of the 1978 conviction because the bill of particulars misdescribed the 1978 offense. See Battenfield, 826 P.2d at 613. Mr. Battenfield's reliance on Presnell v. Georgia, 439 U.S. 14, 16-17 (1978) (an appellate court may not uphold a death sentence upon aggravating factor or circumstance not before the jury), is completely unconvincing. Here, the continuing threat aggravator was contained in the bill of particulars and both the jury and the OCCA were entitled to consider the 1978 conviction in connection with it.